RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)

File Name: 13a0088a.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

_____

UNITED STATES OF AMERICA,
        *Plaintiff-Appellee/Cross-Appellant*
                (11-3394 & 11-3544),
        *Plaintiff-Appellee* (11-3397),

        *v.*

BERNARD J. KURLEMANN,
        *Defendant-Appellant/Cross-Appellee*
                (11-3394 & 11-3544),

ERIC DUKE,
        *Defendant-Appellant* (11-3397).

Nos. 11-3394/3544/3397

Appeal from the United States District Court
for the Southern District of Ohio at Cincinnati.
No. 1:10-cr-14-3—Timothy S. Black, District Judge.

Argued: January 23, 2013

Decided and Filed: April 2, 2013

Before: GUY, SUTTON and COOK, Circuit Judges.

_____

**COUNSEL**

**ARGUED:** Erik W. Scharf, ERIK W. SCHARF, P.A., Coconut Creek, Florida, for Appellant/Cross-Appellee in 11-3394 and 11-3544. David E. Mills, THE MILLS LAW OFFICE LLC, Cleveland, Ohio, for Appellant in 11-3397. Christopher K. Barnes, UNITED STATES ATTORNEY'S OFFICE, Cincinnati, Ohio, for Appellee/Cross-Appellant in 11-3394 and 11-3544, and for Appellee in 11-3397. **ON BRIEF:** Erik W. Scharf, ERIK W. SCHARF, P.A., Coconut Creek, Florida, for Appellant/Cross-Appellee in 11-3394 and 11-3544. David E. Mills, THE MILLS LAW OFFICE LLC, Cleveland, Ohio, for Appellant in 11-3397. Christopher K. Barnes, UNITED STATES ATTORNEY'S OFFICE, Cincinnati, Ohio, for Appellee/Cross-Appellant in 11-3394 and 11-3544. Jennifer C. Barry, UNITED STATES ATTORNEY'S OFFICE, Cincinnati, Ohio, for Appellee in 11-3397.

_____

1

**AMENDED OPINION**

———————————————

SUTTON, Circuit Judge.  Eric Duke and Bernard Kurlemann sold expensive homes to straw buyers who had little income and insufficient cash to make down payments on the sales.  The effective buyers, once the scheme unraveled and the buyers defaulted, became the banks.  Federal prosecutors caught wind of the deception and charged Duke and Kurlemann with making false statements to a lending institution and on top of that charged Kurlemann with bankruptcy fraud.  Duke pled guilty; Kurlemann went to trial.  Duke appeals his sentence; Kurlemann appeals his jury conviction.  The government cross-appeals the district court's rejection of its forfeiture request against Kurlemann.  We affirm in part and reverse in part.

I.

For more than two decades, Kurlemann has built and sold luxury homes in southern Ohio.  Troubles began in 2005, when he borrowed $1.5 million to build a house at 8662 Hampton Bay in Mason, Ohio.  He borrowed another $1.9 million in 2006 to construct a house at 8657 Emerald Isle in the same town.  Neither home sold quickly, and neither was cheap to keep.  Together the mortgages cost more than $16,000 a month to hold and maintain.  Eager to stop the financial bleeding, he enlisted realtor Eric Duke.

Duke found two straw buyers, Francisca Webster and Christopher Gagnon, each willing to lie about their income and assets on the loan applications, and Duke submitted the applications to Washington Mutual Bank.  Kurlemann disclaims knowing anything about the lies.

Duke first submitted a purchase agreement for the Hampton Bay home, proposing that Webster borrow the twenty-percent down payment from Kurlemann.  But the mortgage broker told Duke that Washington Mutual would not approve a loan with a seller-financed down payment.  So Duke revised the purchase contract with this addendum: "Builder also accepts a payment of $229,000.00 to be applied as down payment to meet qualifications for the loan as specified by the lender, received by

builder as of 12/01/06." R.244 at 22. At the broker's request, Duke amended the addendum to reflect that $29,000 was for furniture, leaving $200,000 for the down payment. With this assurance, Washington Mutual approved a $1.9 million loan. At the closing on January 12, 2007, the title company presented a settlement statement summarizing the transaction. Under the heading "Amounts paid by or in behalf of Borrower," the statement said, "Deposit or Earnest Money: $200,000.00." Gov. Br. App'x 37. Kurlemann (through his agent) signed the statement. Webster, for her part, signed another document stating that she had paid $200,000 to Kurlemann in cash and that Kurlemann had not promised to pay or loan her anything outside of the purchase agreement. Truth was, Webster made no cash payment. Her down payment was a promissory note and a second mortgage, committing to pay Kurlemann $229,000 within a year. She signed the note that same day, January 12, immediately after the Washington Mutual loan closing.

Duke used a similar approach for the Emerald Isle home, using Gagnon as the buyer. The purchase agreement said that a "deposit of $280,000.00 (the "Deposit") has been paid to Owner upon signing of this Contract." R.118 at 74–75. This time, Washington Mutual demanded proof that the buyer had released the funds for the deposit. Duke and Kurlemann met this challenge through indirection: Kurlemann transferred $280,000 from Kurlemann Homes of Long Cove to Long Cove Management (both of which he controlled); Long Cove Management transferred the money to Duke's company, Rivendale Management; Duke bought a $280,000 cashier's check, payable to Gagnon; Duke exchanged that cashier's check for another cashier's check from Gagnon to Long Cove; Kurlemann accepted the check as payment from Gagnon; and Duke emailed a copy of the check to the mortgage broker. With proof of the check, though not its itinerary, in hand, Washington Mutual approved a loan for $2 million. At the closing, the settlement statement reported that Kurlemann had received a down payment by listing "Earnest Money Retained by Seller" as "$280,000.00." Gov. Br. App'x at 99. Kurlemann signed this statement. Gagnon signed documents disclaiming borrowing any part of the down payment.

The predictable, perhaps inevitable, happened.  Both buyers defaulted on their loans.  The bank investigated, and federal prosecutors filed a raft of charges against Duke and Kurlemann.  Duke pled guilty to seven counts, including loan fraud and making false statements to a lending institution, and agreed to testify at Kurlemann's trial.  A jury convicted Kurlemann of six counts, including making false statements to a lending institution, *see* 18 U.S.C. § 1014; R.187, and committing bankruptcy fraud, 18 U.S.C. § 157; R. 187 at 2.  The district court sentenced Kurlemann to concurrent 24-month sentences, one for the false-statement convictions and one for the bankruptcy-fraud convictions, and ordered him to pay $1.1 million in restitution.  The district court sentenced Duke to 60 months.

II.

Kurlemann challenges his false-statement and bankruptcy-fraud convictions.

A.

Section 1014 prohibits individuals from "knowingly mak[ing] any false statement or report" for the purpose of influencing a lending institution.  18 U.S.C. § 1014.  A "statement may be false," according to one of the jury instructions in Kurlemann's case, "when it contains a half-truth or when it conceals a material fact."  R.244 at 21.  That is not right.

In full, §1014 says:

> Whoever knowingly makes *any false statement or report*, or willfully overvalues any land, property or security, for the purpose of influencing in any way the action of the Federal Housing Administration, the Farm Credit Administration, Federal Crop Insurance Corporation or a company the Corporation reinsures, the Secretary of Agriculture acting through the Farmers Home Administration or successor agency, the Rural Development Administration or successor agency, any Farm Credit Bank, production credit association, agricultural credit association, bank for cooperatives, or any division, officer, or employee thereof, or of any regional agricultural credit corporation established pursuant to law, or a Federal land bank, a Federal land bank association, a Federal Reserve bank, a small business investment company, as defined in section 103 of the Small Business Investment Act of 1958 (15 U.S.C. 662), or the Small

> Business Administration in connection with any provision of that Act, a Federal credit union, an insured State-chartered credit union, any institution the accounts of which are insured by the Federal Deposit Insurance Corporation, any Federal home loan bank, the Federal Housing Finance Agency, the Federal Deposit Insurance Corporation, the Farm Credit System Insurance Corporation, or the National Credit Union Administration Board, a branch or agency of a foreign bank (as such terms are defined in paragraphs (1) and (3) of section 1(b) of the International Banking Act of 1978), an organization operating under section 25 or section 25(a) of the Federal Reserve Act, or a mortgage lending business, or any person or entity that makes in whole or in part a federally related mortgage loan as defined in section 3 of the Real Estate Settlement Procedures Act of 1974, upon any application, advance, discount, purchase, purchase agreement, repurchase agreement, commitment, loan, or insurance agreement or application for insurance or a guarantee, or any change or extension of any of the same, by renewal, deferment of action or otherwise, or the acceptance, release, or substitution of security therefor, shall be fined not more than $1,000,000 or imprisoned not more than 30 years, or both. The term "State-chartered credit union" includes a credit union chartered under the laws of a State of the United States, the District of Columbia, or any commonwealth, territory, or possession of the United States

18 U.S.C. § 1014 (emphasis added).

That is a long way of saying that "false statement[s] or report[s]" to banks in order to get a loan are prohibited. And that is a long way of *not* saying that the statute prohibits "half-truths," "material omissions" or "concealments," which takes us to the nub of the matter. Whether made orally or offered through a written report, a "false statement" must be that—a statement, a "factual assertion" capable of confirmation or contradiction. *Williams v. United States*, 458 U.S. 279, 284 (1982). An omission, concealment or the silent part of a half-truth, is not an assertion. Quite the opposite. Omissions are failures to speak. *See Black's Law Dictionary* 1197 (9th ed. 2009). Half-truths, in which the speaker makes truthful assertions but conceals unfavorable facts, amount to one type of omission. Concealment, in which the speaker says nothing at all but has a duty to speak, amount to another. No doubt, both types of omissions hold the potential to mislead and deceive. But § 1014 covers "false statements." It does not cover misleading statements, false pretenses, schemes, trickery, fraud or other types of deception.

Nor is this dichotomy between "false statements" and unspoken forms of deception a figment.  As a walk through Title 18 and other titles of the United States Code reveals, Congress has long honored the distinction in criminalizing many types of conduct.  Other criminal statutes apply to anyone who "falsifies, conceals, or covers up by any trick, scheme, or device a material fact," 18 U.S.C. §§ 1001, 1035, or to anyone who makes "any false statement or representation of fact . . . or knowingly conceals, covers up, or fails to disclose any fact," 18 U.S.C. § 1027.  Why create "conceal[ment]" offenses if "falsif[ying]" or making "any false statement" already covers the concept?

Still other criminal statutes distinguish between "false" pretenses and "fraudulent" ones.  Take the mail-fraud statute.  It prohibits anyone from using the postal service or interstate commerce in furtherance of "any scheme or artifice to defraud . . . by means of false or fraudulent pretenses, representations, or promises," 18 U.S.C. § 1341; *see also id.* § 2314 (same).  "False" and "fraudulent" representations do not cover the same thing.  Fraud has long been understood to include a broader range of deceptive conduct.  "The gist of the action," in the Supreme Court's words, "is fraudulently producing a false impression upon the mind of the other party; and, if this result is accomplished, it is unimportant whether the means of accomplishing it are words or acts of the defendant, or his concealment or suppression of material facts not equally within the knowledge or reach of the plaintiff." *Stewart v. Wyoming Cattle Ranche Co.*, 128 U.S. 383, 388 (1888); *see also Black's Law Dictionary* 731 (9th ed. 2009) (defining fraud as "[a] knowing misrepresentation of the truth or concealment of a material fact to induce another to act to his or her detriment").

The securities laws also respect the difference between these concepts, distinguishing between "untrue statement[s]" and "omission[s]."  The Securities Act of 1933 uses the classic definition of a half-truth, prohibiting "any untrue statement of a material fact or any omission to state a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading."  15 U.S.C. § 77q.  And Congress has prohibited securities issuers from falsely representing that a securities "registration statement is true and accurate on its

face or that it does not contain an untrue statement of fact or omit to state a material fact." 15 U.S.C. § 77w. On this statutory record, two things are clear: Congress frequently differentiates between false statements and omissions, and we should not lightly merge the two.

Nor, in view of the distinction, does it make a difference that "any" precedes "false statement." Yes, the term shows that the statute covers any and all false statements. But this breadth of coverage does not change the statute's depth, picking up omissions, half-truths and other forms of unspoken deceit. Just as a statute covering "any" dog owners does not extend to all pet owners, so a statute covering any false statements does not cover all omissions.

*Williams v. United States*, 458 U.S. 279 (1982), respects this line and goes a long way to resolving this case. At issue was whether a "bad check" amounted to a "false statement" under § 1014. Not just one bad check was at issue but a whole series of them. Each was presented by a sophisticated bank president, William Williams, engaged in a check-kiting scheme, the idea being to present checks serially to different banks knowing full well that the accounts contained insufficient funds to cover all of the checks and hoping the banks would give Williams more cash than the balance on his accounts otherwise warranted. *Id.* at 281. The government charged him under § 1014 with falsely "represent[ing] . . . to said bank that said check was of a value equal to the face amount of the check," and a jury convicted him. *Id.* at 283 n.3.

The Court reversed. Even though the checks amounted to a writing, even though they omitted the fact that his bank account held insufficient funds, even though his signature on the checks *implicitly* communicated that the account contained sufficient funds to cover the check and even though Williams clearly intended to defraud the banks, that did not suffice to establish what the statute required—a false statement. *Id.* at 284. This "course of conduct," the Court reasoned, "did not involve the making of a 'false statement,' for a simple reason: technically speaking, a check is not a factual assertion at all" with respect to the amount of funds in an account, "and therefore cannot be characterized as 'true' or 'false.'" *Id.* Instead, the "checks served only to direct the

drawee banks to pay the face amounts to the bearer, while committing petitioner to make good the obligations if the bank dishonored the drafts.  Each check did not, in terms, make any representation as to the state of petitioner's bank balance." *Id.* at 284–85.  To adopt the government's contrary reading—to  characterize "bad checks" as "false statements" with respect to available funds— would "slight[] the wording of the statute" because "a check is literally not a 'statement' at all" as to the amount of funds in an account.  *Id.* at 286 (internal quotation omitted).  After *Williams*, a false-statement prosecution under §1014 cannot generally be premised on implied representations.  It must turn on true-or-false representations later shown to be false.

Any uncertainty about the meaning of *Williams* and its implications for this case are  alleviated by the dissent's analysis of the case.  In criticizing the majority's "technical and literal interpretation," *id*. at 303, the dissent said that the §1014 conviction should be upheld because: the statute covered his conduct so long as he "misle[d] the institutions into making financial commitments," *id.* at 294; "[i]n giving a check, the drawer impliedly represents that he has on deposit with the drawee banks funds equivalent to the face amount of the check," *id.* at 296 (internal quotation omitted); "those who write or accept checks in exchange for goods . . . undoubtedly understand that this implicit representation has been made," *id*. at 297; and the statute covers "the implied representation made when one presents a check," *id.* at 297 n.2.  Last but not least, the dissent complained, the majority's reading of the statute "would apply equally to material omissions or failures to disclose in connection with loan applications"—and thus exonerate such omissions as well.  *Id.* at 296.

This debate ought to ring a bell.  It is the same debate the government and Kurlemann ask us to resolve.  What the dissent said about Williams is what the government says about Kurlemann.  The district court's instruction in this case—a "statement may be false when it contains a half-truth or when it conceals a material fact," R.244 at 21—permits the same kind of implied representation or material omission theory that the *Williams* majority rejected.  Even if a seller's representation that he has received a "down payment" from the buyer in a real estate transaction often implies that

the down payment is not an unsecured promissory note delivered from the buyer to the seller, that is an implication, not proof that the "down payment" representation was a lie, the prerequisite false statement the statute requires. Until Congress opts to extend § 1014 to material omissions, implied misrepresentations or fraud—all ways of getting at deceptive "half truths"—we must take the statute as we find it, and as the Supreme Court has construed it.

Several lower court decisions honor this distinction. In *United States v. Diogo*, 320 F.2d 898 (2d Cir. 1963), Diogo married another solely for immigration purposes. After he claimed to be married, prosecutors charged him with making a false statement under 18 U.S.C. § 1001 on the theory that the marriage, although technically legal, was a sham. *Diogo*, 320 F.2d at 900. The Second Circuit reversed the conviction, distinguishing between false statements and concealment. "False representations . . . require proof of actual falsity; concealment requires proof of wilful nondisclosure by means of a 'trick, scheme or device.'" *Id.* at 902. Although Diogo's conduct was deceitful, it did not rise to the level of a false statement. *Id.*

*United States v. Thorn*, 17 F.3d 325 (11th Cir. 1994), walked a similar path. A jury convicted the defendant under § 1014 for failing to mention in a title policy that the relevant property had an outstanding lien. *Id.* at 327. The Eleventh Circuit reversed. "The title policy," the court explained, "merely stated what insurance was provided. It did not 'make any representation as to the state of' the Frank mortgage," and as a result the court rejected "the government's theory of implied false statements." *Id*. at 328.

Most importantly, our court has rejected a similar theory. In *United States v. Waechter*, 771 F.2d 974 (6th Cir. 1985), a jury convicted Waechter under 18 U.S.C. § 1010 for making false statements to the Department of Housing and Urban Development. The government's theory was that Waechter's scheme—having his "employees submit multiple bids for a single property" in a way that did not disclose that the defendant was behind all of the bids—amounted to false statements "because Waechter intended to withdraw any bid except the lowest bid necessary to outbid his competitors and enable him to purchase a house." *Id.* at 975. The problem, we held,

was that there was no evidence of a false statement. *Id.* We thus rejected the government's claim that the bids amounted to "express false statements by omission." *Id.* at 979.

One other point. Not only does this reading of § 1014 comport best with the statute's text, its relationship with related statutes, and upper-court and lower-court case law, but it also adheres to the rule of lenity. As *Williams* itself explained, "when choice has to be made between two readings of what conduct Congress has made a crime, it is appropriate, before we choose the harsher alternative, to require that Congress should have spoken in language that is clear and definite." *Williams*, 458 U.S. at 290. The only thing "clear and definite" here is that Congress did not proscribe concealment, half-truths or omissions in § 1014.

It is more complicated than that, the Government responds. For one, it claims, *United States v. Walker*, 871 F.2d 1298 (6th Cir. 1989), permits such a "half truth" instruction. But the brief part of *Walker* dealing with § 1014, as opposed to the other parts of the opinion dealing with more expansive criminal statutes, never mentions such an instruction or for that matter the language of the statute or for that matter *Williams*. All of that is because *Walker* was an easy case. The defendant satisfied the statutory test for guilt directly: the relevant count alleged that Walker "made a false statement to the bank," namely "that the grain company had funds to cover the check drawn on [the bank]," *id.* at 1302; and "[i]n applying for the loan, Walker assured [the bank's representative] that he had a check for $300,000 coming in which would cover the overdraft," *id.* at 1309. No "half truth" instruction was needed nor, best we can glean from the decision, given. Yes, the court mentioned "half truths" with respect to a different count—the § 1005 conviction—but that statute covers fraud and thus misleading omissions. *Id.* at 1299 n.1, 1308.

The government also points to other decisions upholding § 1014 convictions on similar facts. *See United States v. Concemi*, 957 F.2d 942, 950 (1st Cir. 1992); *United States v. Miller*, 676 F.2d 359, 363–64 (9th Cir. 1982). But these courts did not address the distinction between assertions and omissions and did not come to grips with (or

mention) the linguistic distinction between § 1014 and other statutes. Other cases stand for the rule that an omission may amount to a false assertion if the omitted information is specifically requested or if the defendant was under a legal duty to disclose the omitted information. *See, e.g.*, *United States v. Haddock*, 956 F.2d 1534, 1550 (10th Cir. 1992) ("The form financial statement [defendant] filled out clearly requested a complete disclosure of [his] financial position."). No such problem arose here, as none of the loan forms or any other law required Kurlemann to supply this information in the context of the settlement statements.

The government also invokes the Sixth Circuit pattern jury instructions, but they too gloss over rather than resolve this linguistic point. According to the pattern instructions,

> The term "false or fraudulent pretenses, representations or promises" means any false statements or assertions that concern a material aspect of the matter in question, that were either known to be untrue when made or made with reckless indifference to their truth. They include actual, direct false statements as well as half-truths and the knowing concealment of material facts.

*Sixth Circuit Pattern Jury Instructions, Criminal*, § 10.01(2)(B) (2009). These instructions are specific to a different statute—18 U.S.C. § 1341—and as shown, "fraudulent pretenses" and "representations" are not the same as "false statements or reports."

If all else fails, the government adds, Kurlemann's convictions nonetheless should stand based on the alternative (and legally correct) theory presented to the jury—that Kurlemann made false statements to the bank. Namely, he stated in the Hampton Bay purchase contract that "Builder also accepts a payment of $229,000 to be applied as down payment to meet qualifications for the loan as specified by the lender, received by builder, as of 12/1/06," and he stated in the Emerald Isle purchase contract that a $280,000 deposit "has been paid to Owner upon signing of this Contract." R. 244 at 22. The only payments, however, were promissory notes signed after the dates of the purchase contracts. But this harmless-error argument runs into *Yates v. United States*, 354 U.S. 298 (1957), and *Griffin v. United States*, 502 U.S. 46, 60 (1991). When a jury

is instructed that it may convict on one of two legal theories, one erroneous and one proper, the possibility that it could choose to convict on the permissible theory does not necessarily save a general guilty verdict from reversal. "Jurors are not generally equipped to determine whether a particular theory of conviction submitted to them is contrary to law," and "there is no reason to think that their own intelligence and expertise will save them from that error." *Griffin*, 502 U.S. at 59.

That is not to say that harmless error may never occur when a jury is instructed on alternative legal theories, one incorrect, one correct. It may—if, to use one example, the error related to an uncontroverted point. *See Hedgpeth v. Pulido*, 555 U.S. 57, 61 (2008) (per curiam). Even then, the government must show "beyond a reasonable doubt that the error complained of did not contribute to the verdict." *Neder v. United States*, 527 U.S. 1, 15 (1999). No such showing was made here. The government's half-truth theory, presumably because it was the easier of the two theories to establish, appeared front and center during Kurlemann's trial, including during closing argument when the government told the jury that Kurlemann's "[c]oncealment, this nondisclosure, it is a common thread," R.146 at 54, and then implored the jury to hold Kurlemann accountable for "the things that he said, the lies that he made, the half truths" he told, *id*. at 56–57. The district court, for its part, thought the half-truth instruction was critical. Without the instruction, it commented, "I worry that the jury will come back and say: What about a half truth?" R.243 at 168. On this record, no harmless error occurred. As a result, we reverse Kurlemann's conviction and remand for retrial. We need not decide whether the government's alternative legal theory—that Kurlemann's deception went beyond concealment to outright lies—is indeed supported by the evidence. That will be for the jury to decide after being properly instructed about the elements of § 1014. Nor for similar reasons do we need to reach Kurlemann's restitution argument or the government's cross-appeal as to forfeiture.

## B.

Kurlemann's statements to a bank were not the only basis for this prosecution. The government also charged Kurlemann with three counts of bankruptcy fraud

unrelated to the sales of luxury homes. In August 2007, one of Kurlemann's business entities, KBI, was defending itself in a civil suit brought by John and Connie Musuraca. KBI at the time owned an undeveloped residential lot—"lot 100"—next to the home where Kurlemann lived. Just before trial in the civil suit, Kurlemann sold the lot to a business associate, Robert Sibcy, for its full market value, $220,000. Sibcy agreed to buy the lot as a favor because Kurlemann needed cash. The deal included an oral agreement that Sibcy would sell the lot back to Kurlemann in one year. The Musucaras, meanwhile, prevailed in their lawsuit, and the court entered a final judgment of $1,152,073.50 against KBI in January 2008. Kurlemann filed a Chapter 7 bankruptcy petition for KBI in March 2008, and did not disclose to the bankruptcy court his agreement with Sibcy to buy back lot 100. *Id.* In April 2008, Kurlemann used another of his companies, KCH, to purchase the lot back from Sibcy for $235,000. Earlier that same day, Kurlemann testified before the bankruptcy trustee that KCH had not received any assets from KBI.

Based on this testimony, the government charged Kurlemann with three felonies: bankruptcy fraud, 18 U.S.C. § 157; concealing assets in bankruptcy, 18 U.S.C. § 152(1); and making false oaths in bankruptcy, 18 U.S.C. § 152(3). A jury convicted Kurlemann on each count, and the court sentenced him to 24 months in prison, concurrent with his other 24-month sentence for making false statements to Washington Mutual. Kurlemann targets several aspects of the bankruptcy-fraud convictions as grounds for reversal.

He first argues that he did not need to disclose the purchase option to the trustee because it was worthless. Debtors in bankruptcy have a duty to disclose all "property of the estate," including "all legal and equitable interests of the debtor in property," 11 U.S.C. § 541(a)(1), (a)(6), an obligation that applies even if the debtors "believe their assets are worthless or are unavailable to the bankruptcy estate," *United States v. Van Allen*, 524 F.3d 814, 822 (7th Cir. 2008). Real-estate option contracts amount to legal interests in property and thus amount to interests that a debtor must disclose in bankruptcy. *See, e.g.*, *United States v. Smithson*, 49 F.3d 138, 140–41 (5th Cir. 1995).

Kurlemann acknowledges as much. But he insists that because Sibcy and he never put their side deal in writing, the option does not satisfy the Ohio statute of frauds, Ohio Rev. Code § 1335.04, making it unenforceable. If the option had no legally recognized value, Kurlemann argues, the government's charges each lack a required element. That is to say: he did not defraud anyone; he did not conceal an asset; and his false statements were not material.

But Kurlemann was required to disclose all assets, even those he thought were "worthless," unenforceable or "unavailable to the bankruptcy estate." *Van Allen*, 524 F.3d at 822. Even if this were not the case, Kurlemann could not deploy the statute of frauds in this procedural posture. The statute of frauds is an affirmative defense that may be raised only by a defendant in response to an action to enforce a contract. 51 *Ohio Jurisprudence* 3d. § 165. It thus renders oral real-estate contracts "voidable but not void." *Id.* A person in Kurlemann's shoes thus cannot invoke it "because in an action based upon the contract itself such a defense might not have been alleged or insisted upon." *Leibovitz v. Cent. Nat. Bank*, 60 N.E.2d 727, 729 (Ohio Ct. App. 1944). Kurlemann's professed belief that the oral option had no legal value fails because the option was not void; it was merely voidable at some future time, and even then only *if* Sibcy (as opposed to Kurlemann) chose to assert the defense.

Kurlemann next argues that he made the option deal in his personal capacity, not on behalf of KBI, and that he later exercised the option through another of his businesses, all showing that KBI did not own the option. The government does not dispute that Kurlemann's duty to disclose assets extended only to "legal or equitable interests of the debtor." 11 U.S.C. § 541. The question is "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found" beyond a reasonable doubt that the option belonged to KBI. *Jackson v. Virginia*, 443 U.S. 307, 319 (1979).

The answer is yes. Kurlemann owned and controlled 100 percent of KBI. KBI's sale of lot 100 to Sibcy and the repurchase arrangement were part of the same transaction, one in which KBI was the seller. Sibcy testified he agreed to the option deal

due to his longstanding business relationship with Kurlemann and due to Kurlemann's track record of building homes in the neighborhood. In Sibcy's mind, the deal was "just another means of us being able to go forward in business." R.143 at 143. The jury could reasonably have concluded that Kurlemann was acting in his business capacity on behalf of KBI, not in his individual capacity. That Kurlemann ultimately exercised the option through another business entity did not preclude the jury from reasonably finding that, at the time of the original deal, Kurlemann acted through KBI.

Kurlemann also claims that the three bankruptcy convictions violated his rights under the Double Jeopardy Clause. A defendant may be convicted of multiple crimes arising from the same course of conduct so long as each charge "requires proof of a fact which the other does not." *Blockburger v. United States*, 284 U.S. 299, 304 (1932). Kurlemann contends that his convictions under 18 U.S.C. §§ 152(1), 152(3) and 157 each required proof of the same facts. Having failed to raise this argument below, he must hang his hat on plain error. *See United States v. Olano*, 507 U.S. 725, 734 (1993).

No plain error, no error at all, occurred. Each count required the government to prove a fact that the others did not. The first charge required the government to prove Kurlemann concealed property "from creditors or the United States Trustee." 18 U.S.C. § 152(1). The second required the government to prove Kurlemann made a false statement "under penalty of perjury." 18 U.S.C. § 152(3). That is why "charging the same conduct under both § 151(1) & (3) does not render an indictment multiplicitous." *United States v. Cluck*, 143 F.3d 174, 179 (5th Cir. 1998). The third charge required the government to prove not just concealment or a false statement during bankruptcy, but also that Kurlemann "devise[d] a scheme or artifice to defraud" and filed a bankruptcy document or made a false statement during bankruptcy proceedings "for the purpose of executing or concealing" the scheme. 18 U.S.C. § 157. Proof of an initial scheme to defraud is not required under the other two charges.

*United States v. Montilla Ambrosiani*, 610 F.2d 65 (1st Cir. 1979), it is true, seemed to hold that prosecutions for both concealment and making a false statement under 18 U.S.C. § 152 violate double jeopardy. *Id.* at 68; *see Cluck*, 143 F.3d at 179 n.7

(noting the conflict).  But it never mentions *Blockburger* or indeed comes to grips with a single constitutional holding in this area.  At all events, potentially conflicting lower-court authority from another circuit does not demonstrate "clear" or "obvious" error, much less error that satisfies the third and fourth prongs of the plain-error doctrine.  *See Olano*, 507 U.S. at 734.

Kurlemann next complains that the district should court have granted his motion for a new trial based on improper statements by the prosecutor to the jury, an issue we review for abuse of discretion.  *United States v. Wimbley*, 553 F.3d 455, 460 (6th Cir. 2009).  During the government's opening statement, the prosecutor said, "[Y]ou're going to hear from the defendant, who is going to try to spin the facts of this case and perhaps even blame others."  R.156 at 19.  Kurlemann objected.  The district court sustained the objection and issued a curative instruction.  The jury instructions made clear that a "defendant has an absolute right not to testify.  The fact that he did not testify cannot be considered by you in any way."  R.178 at 5.  The court took reasonable measures to cure any prejudice and did not abuse its discretion in determining that a new trial was unnecessary.

Relatedly, Kurlemann complains that the government conflated the distinction between him  and his business entities.  Truth answers the charge, as there was "significant evidence that Mr. Kurlemann controlled all of his entities."  R. 178 at 10.  Nor, at any rate, do such comments remotely amount to the kinds of flagrant misconduct that warrants a new trial.  The same is true of Kurlemann's complaints that the prosecutor "resorted to a class warfare theme to enflame the jury by introducing evidence of Kurlemann's supposedly lavish lifestyle."  Def. Br. at 18.  As the district court permissibly concluded, the government stayed within reasonable bounds in offering a motive for Kurlemann's actions:  his expensive tastes.  We affirm the bankruptcy-fraud convictions.

III.

Kurlemann's co-conspirator, Eric Duke, pled guilty to several related charges, and now challenges his 60-month sentence. The challenge is well taken.

As the key witness at Kurlemann's trial, Duke provided substantial assistance to the prosecution, and the government accordingly filed a motion for a downward departure under U.S.S.G. § 5K1.1. At sentencing, the government urged the district court not to specify the amount by which it would depart. The court then said the following before pronouncing its sentence:

> The guideline calculation now properly calculated suggests a sentence between 51 and 63 months . . . .
>
> The government has moved the Court to depart downward from the guidelines in recognition of Mr. Duke's cooperation. I intend to include in my sentence a reflection that he's entitled to some downward departure from my sentence in light of his cooperation. But I believe that a sentence above the guideline range would be properly effected on the facts and the law.
>
> And whatever that sentence would be above the range of the guidelines, when I figure out what that needs to be to accomplish the purposes of sentencing, I need then to reduce it in acknowledgment of Mr. Duke's cooperation. So I grant the government's motion for a downward departure. Not from the guideline range, but from the sentence the Court would otherwise have imposed.
>
> . . .
>
> And, frankly, when I evaluate the 3553 factors and the purposes of sentencing, my sense is that a sentence of ten years would be throughly appropriate. But then when I look at the guidelines and I see that they've been carved back today, I need to get refocused. And whatever sentence I am to impose, if I were to reach a 10 year, I would acknowledge that I would need to reduce that to seven or eight years in light of his cooperation.

R.227 at 49, 51–52. The district court sentenced Duke to 60 months in prison.

Perhaps because the district court was trying to honor the government's request not to specify the extent of its downward departure, this explanation for Duke's sentence is a muddle. The district court normally would determine the applicable guidelines range after accounting for the base offense level, adjustments to the offense level and the defendant's criminal history category. At that point, the district court could grant (or deny) the government's motion for a § 5K1.1 departure, yielding a new guidelines range. The court then would consider the

§ 3553(a) factors to determine an appropriate sentence, whether within the guidelines range or varied upward or downward from it. *See* U.S.S.G. § 1B1.1 (stating that the court should calculate the "particular guideline range," "then consider" departures under § 5K and "then consider the applicable factors in 18 U.S.C. § 3553(a)").

In this instance, the court started by calculating Duke's guidelines range as 51 to 63 months (based on a total offense level of 24 and a criminal history category of I). At that point, the court should have granted (or denied) the § 5K1.1 motion, and, if granting the motion, should have stated the extent of the departure and the new guidelines range. For example, the court might have granted a seven-level departure, producing a guidelines range of 24 to 30 months. Then the court should have decided whether to vary upwards from 30 months to, say, 60 months.

The court instead granted the motion for a downward departure but did not calculate a new guidelines range. It then alluded to imposing an upward variance above the pre-departure guidelines range, which, the court said, would be reduced to reflect Duke's substantial assistance. The court specified no numbers or baselines—except by suggesting that it might impose a ten-year sentence and depart downward to seven or eight years—until the court imposed the 60-month sentence. While the district court's sensitivity to the concerns raised by the government no doubt complicated matters and almost assuredly is the source of this problem, that does not change the reality that this was error, as the government itself now concedes.

What separates the parties is whether the error requires a remand. When a district court asks for objections during sentencing and the defendant remains silent, as happened here, plain-error review applies. *United States v. Vonner*, 516 F.3d 382, 386 (6th Cir. 2008) (en banc). Duke did not object to this procedure, requiring us to ask whether the error affected his "substantial rights" and the "fairness, integrity or public reputation" of the proceedings. *See United States v. Wallace*, 597 F.3d 794, 802 (6th Cir. 2010). It did. Defendants have a "substantial right" to an explanation for their sentence, at least one sufficient to allow for "meaningful appellate review." *United States v. Zobel*, 696 F.3d 558, 568 (6th Cir. 2012). In this instance, we do not know what the post-departure guidelines range was, and as a result we

cannot tell whether, or by how much, the court opted to vary from that range in imposing this sentence. On this record, indeed, it is not clear how Duke could make a substantive-reasonableness challenge to his sentence, a challenge incidentally that is not limited by plain-error review. *See Vonner*, 516 F.3d at 389. Unable to give Duke's sentence the meaningful appellate review to which it is entitled, we must make a limited remand for a new sentencing proceeding.

Duke also asks that a new judge conduct his resentencing, but "there is no evidence in the record indicating that the district judge will have difficulty conducting de novo sentencing procedures," and we trust he will "re-visit the matter with a completely open mind." *United States v. Garcia-Robles*, 640 F.3d 159, 168 (6th Cir. 2011). Because Duke's sentence was procedurally unreasonable, we need not resolve his arguments regarding the district court's consideration of his ability to pay restitution and his leadership role in the offense.

IV.

For these reasons, we affirm in part and reverse in part, and remand both cases to the district court for further consideration.