NOT RECOMMENDED FOR FULL-TEXT PUBLICATION
File Name: 14a0899n.06

No. 13-6656

**UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT**

**FILED**
*Dec 04, 2014*
DEBORAH S. HUNT, Clerk

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff-Appellee, | ) | |
| | ) | ON APPEAL FROM THE |
| v. | ) | UNITED STATES DISTRICT |
| | ) | COURT FOR THE EASTERN |
| LEE C. TEVIS, | ) | DISTRICT OF KENTUCKY |
| | ) | |
| Defendant-Appellant. | ) | |

Before: GIBBONS and KETHLEDGE, Circuit Judges; DOW, District Judge.[*]

KETHLEDGE, Circuit Judge. A jury convicted Lee Tevis of bank fraud in violation of 18 U.S.C. § 1344, aggravated identity theft in violation of 18 U.S.C. § 1028A, and several related charges. On appeal, Tevis argues that the district court erred in excluding certain evidence of settlement and insurance agreements, denying his motions for acquittal and a new trial, and instructing the jury. We affirm.

I.

In 2005, James Tate, president of American Founders Bank, hired Lee Tevis to construct a 6,000-square-foot home for Tate and his family in Frankfort, Kentucky. Tevis estimated that the home would cost $575,000 to build. Tate and Tevis did not sign a contract.

Tate did not want to pay for the home out-of-pocket, and he could not borrow money from his Bank without its Board's approval. Rather than seek that approval, in June 2005 Tate

---

[*]The Honorable Robert M. Dow, Jr. Judge for the Northern District of Illinois, sitting by designation.

authorized the Bank to loan $575,000 to Tevis's company, Lee C. Tevis Custom Homes 101, LLC. That same month, Tate also authorized the Bank to loan $425,000 to Edge Custom Homes, LLC, whose only member was Tevis's wife. Tevis used the proceeds of this loan to buy the lots on which he built the Tate home.

The costs of building the Tate home far exceeded Tevis's $575,000 estimate. Over time, the house's size grew from 6,000 to 11,000 square feet. Tevis also made several changes to the house's design, which required, among other things, replacement of the roof and $60,000 worth of custom windows. Tate and Tevis soon realized they needed more money to finish the house.

Tate could authorize the Bank to lend only $1 million of secured debt and $100,000 of unsecured debt to any one person. He had already lent that much to Tevis; so Tevis asked his construction foreman—an undocumented alien named Renato Martinez—to help obtain an additional loan. Martinez agreed. In September 2006, Tevis and Martinez went to the Kentucky Department of Revenue, where Tevis created Two Amigos, LLC. Tevis listed Martinez as the only member. Tevis used his own social security number (SSN), because Martinez did not have one.

Tevis and Martinez then went to Tate's office at the Bank to seek a Bank loan. The Bank required a SSN to make a loan—and Tate could not use his own or Tevis's—so Martinez supplied the SSN of his five-year-old son, JM. Tate then authorized the Bank to make a $100,000 unsecured loan to Two Amigos. The money was ostensibly loaned to provide funding for "business expenses," but Tate and Tevis both knew that Two Amigos had no assets or expenses. All the funds for that loan went to Tevis.

The $100,000 loan was depleted by December 2006, but Tevis still had not finished the house. So Tate authorized the Bank to loan another $300,000 to Two Amigos. The loan

application again used JM's social security number and stated that the loan's purpose was to "establish a business line of credit." Tate could not make additional unsecured loans to Two Amigos, so Martinez and Tevis signed an agreement under which Custom Homes pledged its assets—the Tate home—to secure the loan. Again, Tevis received all the funds for the loan.

The $300,000 loan was depleted by March 2007, but by then Tevis still had not finished the house. So Tate authorized the Bank to loan another $995,000 to Two Amigos, again using JM's social security number. Martinez and Tevis signed an agreement under which Edge pledged its assets—the lots—to secure the loan. Tate used a portion of the loan to pay off the $300,000 Two Amigos loan, and used the rest to refinance the original loan to Tevis's company. Tate then gave Tevis a check for $650,000 and told him to deposit it at a different bank. Tate explained that he thought that the Bank would soon discover his activity and deny access to the money. Per Tate's direction, Tevis deposited the $650,000 into his own bank account at a different bank. Meanwhile, on the same day that the Bank issued the third Two Amigos loan, Tate, Tevis, and Martinez signed documents that released Martinez and Tevis from liability on the loans.

The Bank discovered Tate's illegal loans to Two Amigos in March 2007. The Bank's Board told Tate that, if he did not resign, he would be fired. Tate resigned. Tevis later sent Tate a letter demanding $2.3 million for the Tate home. But the home was never completed and the Bank sold it for only $250,000. The Bank thereafter sued Tate, Tevis, Martinez, and Tevis's business partners for fraud, and later settled with all the defendants except Tate.

The government eventually brought criminal charges against Tate and Tevis in federal court. Tate pled guilty to filing false loan documents, but Tevis proceeded to trial on charges of

bank fraud, aggravated identity theft, and aiding and abetting Tate's crimes. Tate, Martinez, and Tevis all testified at trial.

During jury deliberations, the jurors sent several notes to the court. In one of the notes, the jurors expressed confusion about the aggravated-identity-theft charges. Over Tevis's objection, the court read supplemental instructions. In the other notes, the jury reported that it had not yet reached an agreement on some of the charges. Tevis moved for a mistrial, but the court read the jury the Sixth Circuit pattern instruction for deadlocked juries instead. Eventually, the jury acquitted Tevis of one count—conspiracy to commit bank fraud—but convicted him of the rest. This appeal followed.

## II.

## A.

Tevis challenges two of the district court's evidentiary rulings. We review both rulings for an abuse of discretion. *United States v. Morales*, 687 F.3d 697, 701 (6th Cir. 2012).

The first ruling concerned an insurance policy that allowed the Bank to recover for fraudulent loans if the Bank employee who authorized the loans colluded "with [a party] to the transactions." In Tevis's view, under this policy, the Bank would recover all of its losses if the jury convicted him. Tevis sought to admit the policy into evidence and to cross-examine the former Chief Credit Officer of the Bank—John Davis—about it. The court refused to admit the policy into evidence, but allowed Tevis to ask Davis if the Bank would obtain any recovery if Tevis were convicted. The court made clear, however, that no matter what Davis's answer was, Tevis could not impeach Davis with the policy.

Tevis contends that the court abused its discretion when it did not allow him to cross-examine Davis with the insurance policy. Specifically, Tevis asserts that the policy would

suggest to the jury that Davis wanted to help convict Tevis so that the Bank could recover under the policy. But Davis had left his job at the Bank a year before Tevis's trial, and otherwise had no apparent financial interest in the trial's outcome. Given the policy's dubious impeachment value—and its irrelevance to the question whether Tevis violated the law—the district court did not abuse its discretion in limiting Tevis's cross-examination of Davis. *See United States v. Howard*, 621 F.3d 433, 456-57 (6th Cir. 2010).

Tevis also contends that the court abused its discretion by not admitting the policy into evidence, because, Tevis says, the policy showed that he was being prosecuted "because the Bank [could not] recoup its losses during the civil case." But the government can prove bank fraud even if the bank did not suffer loss. *See United States v. Warshak*, 631 F.3d 266, 313 (6th Cir. 2010). The Bank's losses were therefore irrelevant to Tevis's prosecution, and this argument fails.

The second ruling concerns the agreement by which the Bank settled its civil lawsuit. Under that agreement, the Bank settled with every defendant except Tate, forgave the Two Amigos loans, and paid Tevis's attorneys' fees. The district court allowed Tevis to ask witnesses some questions about the civil suit and settlement; but the court refused to admit the agreement into evidence, holding that the agreement's admission would violate Rule 408.

Tevis contends that the settlement is proof that the Bank's management thought that Tevis was not culpable for criminal fraud, because the civil suit and criminal case involved the "exact same accusations about the exact same loans." Rule 408—which applies in both civil and criminal cases—bars the admission of settlement agreements when offered "to prove or disprove the validity or amount of a disputed claim." *See* Fed. R. Evid. 408 & advisory committee's notes (2006 amendments). The "disputed claim" language refers only to the claim that is the "subject

of the compromise." *See Uforma/Shelby Bus. Forms, Inc. v. N.L.R.B.*, 111 F.3d 1284, 1293-94 (6th Cir. 1997) (internal quotation marks omitted). And here the subject of the compromise was the Bank's claims that Tevis committed civil fraud. For the jury to infer from the settlement agreement that the Bank's management did not believe that Tevis committed criminal fraud, the jury would have to infer first that Tevis's actions did not constitute civil fraud. Both inferences go to the Bank's belief about the "validity or invalidity of the compromised claim"—civil fraud—and are therefore barred by Rule 408. *Cf. id.* at 1294 (evidence of compromise of a different claim is barred if it requires an inference about the settling party's belief in the validity of the disputed claim). Thus, the court did not abuse its discretion.

B.

Tevis next brings a raft of sufficiency challenges to his convictions. Here we ask merely if, "after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979).

Tevis first challenges the sufficiency of the evidence that he committed bank fraud under 18 U.S.C. § 1344. To establish bank fraud, the government must prove, among other things, that Tevis "knowingly execute[d] . . . a scheme or artifice" to defraud a federally insured financial institution. *United States v. Abboud*, 438 F.3d 554, 590 (6th Cir. 2006) (internal quotation marks omitted).

Tevis argues that the government failed to prove these elements here. He contends that there was no fraud because Tate's boss—Tim Wesley—approved the Two Amigos loans. But Tate testified otherwise, which is reason enough to reject this argument. Tevis also contends that, if there was any fraud, he had nothing to do with it. But Tevis himself admitted that he

recruited Martinez—who he knew was an undocumented alien without a SSN—to obtain additional financing for the Tate home. Tevis also created Two Amigos under Martinez's name, asked Martinez for JM's SSN, and gave the SSN to Tate. Moreover, though the Bank made the loans for "business expenses," Tevis knew that Two Amigos had neither business nor expenses, and that all of the money would go to him. There was ample evidence to support Tevis's conviction for bank fraud.

Tevis next challenges the sufficiency of the evidence that he aided and abetted making a false statement to a bank, in violation of 18 U.S.C. § 1014. That section prohibits, in relevant part, "knowingly mak[ing] any false statement . . . for the purpose of influencing" the action of a federally insured institution "upon any . . . loan[.]" 18 U.S.C. § 1014. To show that Tevis aided and abetted a violation of § 1014, the government must prove two elements: "(1) an act by [Tevis] that contributed to the commission of the crime; and (2) [Tevis's] intent to aid in the commission of the crime." *United States v. Bronzino*, 598 F.3d 276, 279 (6th Cir. 2010). Tevis argues that the government presented no evidence that he made any false statement for the purpose of influencing the Bank to make the Two Amigos loans. Suffice it to say that the evidence afforded the jury ample basis to find that the loan applications were rife with false statements, and that Tevis played a direct role in making them.

Tevis next challenges the sufficiency of the evidence that he aided and abetted Tate's embezzlement of bank funds, in violation of 18 U.S.C. § 656. To show a violation of that section, the government must prove that a bank officer embezzled or willfully misapplied bank funds, and that the officer had the intent to injure or defraud the bank. *See United States v. Woods*, 877 F.2d 477, 479 (6th Cir. 1989). Here, Tate knowingly obtained fraudulent loans from the Bank and gave the money to Tevis. Again, suffice it to say that the evidence allowed a

rational jury to find that Tate embezzled funds—and that Tevis helped him every step of the way.

Finally, Tevis challenges the sufficiency of the evidence that he committed aggravated identity theft, in violation of 18 U.S.C. § 1028A. To violate that section, a defendant must "knowingly transfer[], possess[], or use[], without lawful authority, a means of identification of another person" while committing an underlying felony. 18 U.S.C. § 1028A(a)(1). Tevis argues that he did not violate this section because he did not "use" JM's social security number. But Martinez testified that Tevis asked for JM's number and then gave the number to Tate for use in the loan applications. The jury was entitled to believe that testimony.

Sufficient evidence therefore supported Tevis's convictions. For that reason, moreover, the district court properly denied his motions for an acquittal and for a new trial.

C.

Tevis's remaining arguments concern the jury's deliberations. He first challenges the court's supplemental jury instructions. During deliberations, the jury sent the judge a note that requested clarification on the aggravated-identity-theft charges. In the note, the jurors asked whether they needed to find Tevis guilty of the other charges (counts 1-8) to find him guilty of aggravated identity theft (counts 9-11). In response to this note, the judge read supplemental instructions that explained the relationship between the charges. As an example, for the charge of bank fraud (count 2), the judge instructed:

> A guilty verdict for Count 2 . . . bank fraud standing alone will support a conviction for Counts 9, 10, and 11. Again, if each and every one of the elements for Counts 9, 10 and 11 are found beyond a reasonable doubt.

Tevis argues that these instructions were misleading and asserts that they allowed the jury to convict him of aggravated identity theft based solely on his convictions on the other charges.

But the last sentence of this instruction plainly states that the jury must find the elements of counts 9, 10, and 11 to convict Tevis of aggravated identity theft. So this argument fails.

Tevis's final argument concerns the district court's *Allen* charge, which it issued after the jury sent the court two notes stating they were deadlocked. Tevis argues that the court should have declared a mistrial instead. We disagree. Given that the trial lasted a week and that the jury had deliberated for less than two days, the district court did not abuse its discretion in issuing an *Allen* charge or denying Tevis's motion for a mistrial. *See, e.g.*, *United States v. Roach*, 502 F.3d 425, 440 (6th Cir. 2007) (*Allen* charge); *In re Ford*, 987 F.2d 334, 339-40 (6th Cir. 1992) (mistrial); *United States v. Reed*, 167 F.3d 984, 991 (6th Cir. 1999) (upholding *Allen* charge given on twelfth day of deliberations); *United States v. Cochran*, 939 F.2d 337, 340 (6th Cir. 1991) (giving *Allen* charge after two days of deliberations).

The district court's judgment is affirmed.