RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)
File Name: 15a0154p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

───────────────

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

v.

KATHY MEDLOCK (14-5084); WOODY H. MEDLOCK, SR. (14-5100),

*Defendants-Appellants.*

Nos. 14-5084/5100

Appeal from the United States District Court
for the Middle District of Tennessee at Nashville.
No. 3:10-cr-00004—Todd J. Campbell, Chief District Judge.

Argued: January 15, 2015

Decided and Filed: July 17, 2015

Before: BOGGS, SILER, and CLAY, Circuit Judges.

───────────────

**COUNSEL**

**ARGUED:** Brian D. Roark, BASS, BERRY & SIMS PLC, Nashville, Tennessee, for Appellant in 14-5100. Sandra G. Moses, UNITED STATES ATTORNEY'S OFFICE, Nashville, Tennessee, for Appellee. **ON BRIEF:** Brian D. Roark, David S. Mitchell, BASS, BERRY & SIMS PLC, Nashville, Tennessee, Barry R. Tidwell, BULLOCK, FLY, HORNSBY, & EVANS, Murfreesboro, Tennessee, for Appellant in 14-5100. Hershell D. Koger, Pulaski, Tennessee, for Appellant in 14-5084. Sandra G. Moses, UNITED STATES ATTORNEY'S OFFICE, Nashville, Tennessee, for Appellee.

1

_____

**AMENDED OPINION**

_____

BOGGS, Circuit Judge.   Defendants-Appellants Woody and Kathy Medlock (the Medlocks) appeal their jury convictions for aggravated identity theft, health-care fraud, and related crimes.[1]  The Medlocks, who are married, owned and operated Murfreesboro Ambulance Service (MAS), a non-emergency ambulance company that transported Medicare patients to regular kidney-dialysis appointments.  In their appeals, which we decide together, the Medlocks argue that:

(1) their misrepresentation that certain beneficiaries were transported by stretcher (entitling the Medlocks' company to reimbursement) does not constitute a "use" of identification under 18 U.S.C. § 1028A;

(2) the district court should have instructed the jury that, for the purposes of the fraud statute, Medicare, not merely a prudent person, was the relevant decision-maker;

(3) as a matter of law, they are not guilty of defrauding Medicare, because the program would have reimbursed their company even without their misrepresentations;

(4) the evidence did not suffice to support their convictions; and

(5) the court's refusal to sever either the two defendants from one another or the charge specific to Kathy Medlock from the other charges prejudiced Woody Medlock.

For the following reasons, we reverse the district court's judgment that the Medlocks violated 18 U.S.C. § 1028A (criminalizing aggravated identity theft), and affirm the other judgments of the district court.

**I**

MAS transported patients to kidney dialysis.  Medicare reimbursed MAS for those transports.  United States Department of Health and Human Services (HHS) regulations provide that Medicare will reimburse non-emergency ambulance transport only when such transport is

_____

[1]The Medlocks' son, Woody Medlock, Jr., (also known as "Bubba Medlock") was indicted along with his parents, but the jury acquitted him on all charges.

medically necessary for bedridden patients, i.e., when any alternative form of transport, such as taxicabs, is contraindicated.  42 C.F.R. § 410.40 (regulating Medicare payment for certain non-emergency repetitive transports).  Medicare policy requires that, in addition to the driver, an Emergency Medical Technician (EMT) accompany any such passenger.  The ambulance company documents each trip with a certification of medical necessity (CMN), signed by a doctor, and a "run sheet,"[2] which a Medicare contractor other than the ambulance company reviews to determine whether Medicare should reimburse the company for the trip.

Medicare contracts with AdvanceMed Corporation to reduce waste, fraud, and abuse.  In or before 2006, AdvanceMed analysis identified MAS as the fifth-highest biller in Tennessee for ambulance transports to dialysis.  Accordingly, in December 2006, AdvanceMed audited MAS's billing office.  MAS's records were missing some CMNs.

As part of the same investigation, in December 2006, August 2007, and September 2007, Special Agent Christ Covington of HHS, Office of the Inspector General, covertly surveilled a dialysis clinic to which MAS transported patients.  Agent Covington videotaped four patients walking, riding in the front seat, being double-loaded in an ambulance (i.e., being driven two patients, rather than one, at a time), being driven by single-staffed ambulances, or being transported by wheelchair (rather than stretcher).  MAS had billed the transports as single-passenger and "stretcher required" (or equivalent).

Investigators also executed a search warrant at the Medlocks' home.  They seized an envelope during that search that contained CMNs and run tickets.  Some CMNs obtained during the search and by subpoena had been altered.  The government later established that some of

---

[2]The government's expert testified that, "[f]or an ambulance" transport seeking Medicare reimbursement, "almost all they have documentation-wise" is a run sheet, also called a run ticket or trip ticket, and the Certification of Medical Necessity" (CMN).  Citing this expert's testimony, the government explained on appeal that

> Medicare requires the provider to keep a copy of the run sheet, that is[,] the document filled out during transport, and it must support the service [provided]. The run sheet must be provided to Medicare upon request.  The run sheet must contain certain information, such as name and address of patient, names of attendants on the ambulance[,] and a description documenting the need for ambulance transportation and why the patient could not have gone by other means.  For repetitive ambulance transport, a patient would not qualify for Medicare reimbursement if the patient can sit in a wheelchair, ride in the front seat of a vehicle[,] or be able to walk.

Appellee Br. 9 (citations omitted).  In addition, "[i]f there was only one EMT transporting a patient by himself," without another person driving the ambulance, that transport would not "be reimbursable."

these CMNs and run tickets had been forged altogether at Kathy Medlock's direction.  On July 27, 2011, a grand jury indicted the Medlocks on several counts, including:

> (1) one count of conspiracy to commit health-care fraud and make false statements related to health care matters, in violation of 18 U.S.C. § 371;
>
> (2) eighteen counts of health-care fraud, in violation of 18 U.S.C. § 1347;
>
> (3) eighteen counts of making a false statement in connection with payment for health-care benefits, in violation of 18 U.S.C. § 1035;
>
> (4) two counts of wire fraud, in violation of 18 U.S.C. § 1343; and
>
> (5) two counts of aggravated identity theft, in violation of 18 U.S.C. § 1028A(a)(1).

The grand jury also indicted Kathy Medlock on an additional count of aggravated identity theft, in violation of 18 U.S.C. §§ 2 and 1028A(a)(1).

At trial and on appeal, the government and the Medlocks dispute whether Medicare would have reimbursed MAS for the transport of a patient who could have been transported by other means and whether Medicare would reimburse for a transport authorized by a CMN but without a run ticket.  The Medlocks claim that either a CMN or an actual medical necessity was sufficient for reimbursement as a matter of law, so that any fabrication of run sheets was immaterial to reimbursement and therefore not criminal.  Woody Medlock filed proposed jury instructions to this effect.  Several of the proposed instructions remain relevant on appeal: He proposed instructions pertaining to the health-care counts suggesting that the relevant statutes' requirements that false statements be material meant material to Medicare, not merely to a prudent person; Medlock also proposed instructions defining "materiality" in more detail.  Together, the instructions suggested that the government bore the burden of proving that the transports at issue both lacked valid CMNs *and* were medically unnecessary.

The court refused to provide Woody Medlock's instructions to the jury.  To accommodate the Medlocks' argument, the court offered to give a different charge, containing the language of the relevant regulations.  Both the United States and the Medlocks asked the judge *not* to give that different charge.  Ultimately, counsel for Woody Medlock and counsel for Kathy Medlock stated that their clients were "satisfied with the jury instructions."

The Medlocks were tried between May 21 and 31, 2013. The jury convicted the Medlocks on all counts. On January 16, 2014, the court sentenced Woody Medlock to imprisonment for 75 months and Kathy Medlock to imprisonment for 70 months.

**II**

We first address the Medlocks' contention that they did not "use" the names of patients within the meeting of the aggravated-identity-theft statute.

18 U.S.C. § 1028A ("Aggravated Identity Theft" in Chapter 47, "Fraud and False Statements") provides that "[w]hoever, during and in relation to" a violation of the health-care fraud or certain other statutes "knowingly . . . uses, without lawful authority, a means of identification of another person shall, in addition to the punishment provided for such felony, be" imprisoned for a period in addition to his imprisonment for fraud. 18 U.S.C. § 1028A(2)(1). For the purposes of § 1028A(a)(1), a "means of identification" is defined as "any name or number that may be used, alone or in conjunction with any other information, to identify a specific individual." 18 U.S.C. § 1028(d)(7).

The government alleged that the Medlocks "used" the name and Medicare Identification Numbers of Medicare beneficiaries when they "caused a claim to be submitted to Medicare for reimbursement that contained" such names and numbers "without lawful authority to do so because the claim falsely stated that" stretchers were required for transport. In addition, the government alleged that Kathy Medlock *used* the signature of a certain doctor in order to forge CMNs.

"Whether a criminal statute applies to the proven conduct of the defendant is an issue of statutory interpretation that we review de novo." *United States v. Miller*, 734 F.3d 530, 539 (6th Cir. 2013). This court must start "with the language of the statute." *Bailey v. United States*, 516 U.S. 137, 144 (1995) (construing "use" in a different statute). "The word 'use' in the statute must be given its 'ordinary or natural' meaning, a meaning variously defined as '[t]o convert to one's service,' 'to employ,' 'to avail oneself of,' and 'to carry out a purpose or action by means of.'" *Ibid.*; *see also* Black's Law Dictionary at 1777 (10th ed. 2014) (defining use), Webster's Ninth New Collegiate Dictionary at 1299 (1986) (same).

In *United States v. Miller*, we held that a managing member of an LLC "did not 'use' a means of identification within the meaning of § 1028A by signing a document in his own name which falsely stated" that his business partners authorized him to apply fraudulently for a loan. 734 F.3d at 542. In that case, the defendant wrote down the names of his business partners on a document purporting to be minutes of a meeting wherein they authorized him to apply for a (fraudulent) bank loan. We applied the canons of *noscitur a sociis* and *ejusdem generis* to narrow the definition of "use": since Congress placed "use" near "transfers" and "possesses," "both of which are specific kinds of use . . . . the meaning of 'uses' is not as expansive as the government suggests and . . . the term must have practical boundaries . . . ." *Ibid*. Accordingly, this court held that, "as a matter of law, [the defendant] did not 'use' a means of identification within the meaning of § 1028A by signing a document in his own name which falsely stated that" his business partners gave him authority to act on behalf of the business with respect to the loan. *Miller*, 734 F.3d at 542.

This rationale remains persuasive. Given the statutory scheme at issue here, "use" must have a more limited definition than the government suggests. The government's contention precisely is that the beneficiaries whom the Medlocks transported were *not* entitled to reimbursed rides. That the defendant in *Miller* lied about what his *partners* did and the Medlocks lied about what *they* did does not distinguish the cases. The Medlocks *did* transport the specific beneficiaries whose names they entered on the forms; they lied only about their own eligibility for reimbursement for the service. There was nothing about those particular beneficiaries, rather than some other lawful beneficiaries of Medicare, that entitled them to reimbursed rides.[3]

In addition, the Sixth Circuit's Pattern Jury instructions seem to contemplate a narrow reading of "use" in § 1028A:

> [t]he term 'use' means active employment of the means of identification during and in relation to the crime charged . . . . 'Active employment' includes activities

---

[3]*Miller* differs from the present case only in immaterial ways. The defendant in *Miller* wrote down his partners' names to indicate that they did something they did not do. If actions involving names lie along an identity-theft spectrum (and neither the Medlocks nor we suggest that they do as a legal matter), the Medlocks used (or misused) even less than the *Miller* defendant did, because they did not lie about anyone else. The distinction between a criminal lying about himself or lying about another does not affect the definition of "use" under the statute.

such as displaying or bartering.  'Use' also includes a person's reference to a means of identification in his possession for the purpose of helping to commit the crime . . . .

Sixth Cir. Pattern Jury Instructions 15.04.  The Medlocks did not display, barter, or refer to means of identification as such during, in relation to, or for the purpose of helping to commit the crime.

The cases that the government cites do not undermine this conclusion.

The United States cites *United States v. Tevis*, 593 F. App'x 473 (6th Cir. 2014) for the proposition that "the inclusion of another person's social security number on a fraudulent loan application was sufficient to qualify as 'use' for the purposes of violating the aggravated identity theft statute."  28(j) Letter (Jan. 12, 2015).  *Tevis* concerns, in relevant part, the use by a bank defrauder of his colleague's five-year-old son's Social Security number in a fraudulent application for a loan not in the son's name.  A jury convicted the defendant of violating 18 U.S.C. § 1028A.  The defendant argued "that he did not violate this section because he did not 'use' [the son's] social security number."  *Tevis*, 593 F. App'x at 478.  Disagreeing in an unpublished opinion, we held that, because the colleague testified that the defendant asked for the number and gave it to an accomplice who used it in a loan application, "[t]he jury was entitled to believe that testimony.  Sufficient evidence therefore supported [the] convictions." *Ibid.*

*Tevis* focused on the question of sufficiency, not the meaning of "use" under 18 U.S.C. §1028A.  Unlike the *Tevis* defendant, the Medlocks did not attempt to pass themselves off as anyone other than themselves.  Their misrepresented *how and why* the beneficiaries were transported, but they did not use those beneficiaries' identities to do so.

A simple hypothetical exemplifies the flaw in the government's logic: an overcharging merchant.  In the course of the committing health-care fraud, our hypothetical defendant bills his patient (or that patient's insurer, public or private) in his actual name, stating that the medical service, which the defendant really did provide, costs $200, when really it costs $100. On the government's logic, that lie would constitute a *use* of the patient's name, and so would be aggravated identity theft.

The government also relies on *United States v. Abdelshafi*, 592 F.3d 602 (4th Cir.), *cert. denied*, 131 S. Ct. 182 (2010). *Abdelshafi* concerned the prosecution under 18 U.S.C. § 1028A of the owner and operator of a third-party vendor providing transportation services to Medicaid patients. The defendant's logs included "the patient's identifying information[, which] included that person's Medicaid identification number." *Abdelshafi*, 592 F.3d at 605. The defendant "not only inflated mileage amounts, but also submitted claim forms for trips that did not, in fact, occur." *Ibid.* The defendant argued "that he could not be guilty of aggravated identity theft because he did not use Medicaid patients' identifying information 'without lawful authority.'" *Ibid*.

Following the Eleventh Circuit's reasoning in *United States v. Hurtado*, 508 F.3d 603 (11th Cir. 2007), *abrogated in part on other grounds by Flores-Figueroa v. United States*, 556 U.S. 646 (2009), the Fourth Circuit held that the plain text of the statute did not indicate that the means of identification must have been stolen in order to have been used "without lawful authority." *See Abdelshafi*, 592 F.3d at 607. In addition, other provisions in the relevant title specify crimes that require an identification document to have been stolen. *Id.* at 608 (citing 18 U.S.C. § 1028(a)(2) & (6)). Had Congress wanted to include that requirement in the relevant provision, the Fourth Circuit suggested, it knew how to do so. And Congress's choice made sense: "After all, the use of another person's means of identification makes a fraudulent claim for payment much harder to detect . . . ." *Abdelshafi*, 592 F.3d at 610.

The United States Supreme Court considered 18 U.S.C. § 1028A in *Flores-Figueroa v. United States*, 556 U.S. 646 (2009). In light of *Flores-Figueroa*, we, in turn, reconsidered § 1028A, in *United States v. Lumbard*, 706 F.3d 716 (6th Cir. 2013). The defendant in *Lumbard* had agreed to purchase a driver's license, Social Security number, and birth certificate from a man who resembled him.[4] The defendant obtained a passport in the seller's name, staged his own suicide, and fled the country to Burma, where he later was arrested. The Burmese authorities extradited him to the United States, where a grand jury indicted him for violating 18 U.S.C. § 1028A, among other crimes. On appeal, we construed *Flores-Figueroa* to mean that

---

[4]The seller did not deliver the Social Security card or birth certificate. Prior to this purchase, the defendant had evaded arrest and was wanted on warrants charging breaking and entering, destruction of a building, larceny, aggravated battery, obstruction of justice, receiving stolen property, and other crimes.

"§ 1028A requires the government [to] prove a defendant knows the identifying information he misuses belongs to a real individual." *Lumbard*, 706 F.3d at 722 (citing *Flores-Figueroa*, 556 U.S. at 657). Because *Flores-Figuroa* focused on "the *mens rea* required for commission of the offense, which is not at issue here[, t]he Court's focus on fraud versus theft is instructive, but not determinative." *Lumbard*, 706 F.3d at 722. Starting with the statutory language, *ibid.*, this court showed that the definition of "lawful" is not "confined to permission," *id.* at 723.

Rejecting the defendant's appeal to legislative history, in part because the Supreme Court called the same history inconclusive, *id.* at 724 (citing *Flores-Figueroa*, 556 U.S. at 655), we concluded "that the phrase 'without lawful authority' in § 1028A is not limited to instances of theft, but includes cases where the defendant obtained the permission of the person whose information the defendant misused." *Lumbard*, 706 F.3d at 725; *see also id.* at 724-25 (observing that this holding was not contrary to *United States v. Mobley*, 618 F.3d 539 (6th Cir. 2010)); *Lumbard*, 706 F.3d. at 725 (observing that six other circuits "concluded that § 1028A extends beyond mere theft," that "[f]our of the[m] decided the issue after *Flores-Figueroa*," and citing cases).

Although *Abdelshafi* and *Lumbard* demonstrate that the Medlocks acted "without lawful authority" for statutory purposes, the Medlocks' misrepresentation that certain beneficiaries were transported by stretchers does not constitute a "use" of those beneficiaries' *identification* under the federal aggravated-identity-theft statute, 18 U.S.C. § 1028A, because their company really did transport them.

### III

The district court did not err by refusing Woody Medlock's proposed jury instructions regarding materiality. If it did err, any error was harmless. And the Medlocks' conduct was material under 18 U.S.C. §§ 1035 and 1347. These two separate issues—whether the Medlocks' actions were material as a matter of law and whether the court's failure to instruct the jury on materiality prejudiced the Medlocks—turn on the same questions.

**A**

The Medlocks' argument that their fabrication of run sheets was not material[5] to the Center for Medicare and Medicaid Services' (initial) decision to reimburse MAS fails to persuade us for at least two reasons.

First, it is a "cardinal principle of statutory construction that courts must give effect, if possible, to every clause and word of a statute." *Williams v. Taylor*, 529 U.S. 362, 364 (2000) (quotation marks omitted). The regulations provide that "Medicare covers *medically necessary* nonemergency, scheduled, repetitive ambulance services if the ambulance provider . . . obtains a [CMN]." 42 C.F.R. § 410.40(d)(2) (emphasis added). In other words, Medicare covers "nonemergency, scheduled, repetitive ambulance services" only if both (1) those services are medically necessary and also (2) the ambulance provider obtains a CMN. On the Medlocks' theory, obtaining a CMN demonstrates medical necessity. But if a CMN was all that was

---

[5]18 U.S.C. § 1035 provides, in relevant part, that:

> (a) Whoever, in any matter involving a health care benefit program, knowingly and willfully--
> (1) falsifies, conceals, or covers up by any trick, scheme, or device a *material* fact; or
> (2) makes any *materially* false, fictitious, or fraudulent statements or representations, or makes or uses any *materially* false writing or document knowing the same to contain any *materially* false, fictitious, or fraudulent statement or entry,
> in connection with the delivery of or payment for health care benefits, items, or services, shall be fined under this title or imprisoned not more than 5 years, or both.

(emphases added).

18 U.S.C. § 1347 provides:

> (a) Whoever knowingly and willfully executes, or attempts to execute, a scheme or artifice--
> (1) to defraud any health care benefit program; or
> (2) to obtain, by means of false or fraudulent pretenses, representations, or promises, any of the money or property owned by, or under the custody or control of, any health care benefit program,
> in connection with the delivery of or payment for health care benefits, items, or services, shall be fined under this title or imprisoned not more than 10 years, or both. If the violation results in serious bodily injury (as defined in section 1365 of this title), such person shall be fined under this title or imprisoned not more than 20 years, or both; and if the violation results in death, such person shall be fined under this title, or imprisoned for any term of years or for life, or both.
> (b) With respect to violations of this section, a person need not have actual knowledge of this section or specific intent to commit a violation of this section.

required to determine medical necessity, then the part of the regulation that required run sheets would be redundant. We choose to give effect to every word of the regulation.

Second, the run-sheet process allows review of "the Medicare payment decision [that would otherwise be] left in the hands of a random doctor whose interest may be far from the integrity of the Medicare program . . . ." Appellee Br. 40. In construing the regulation—and in imagining how MAS and other parties involved in the provision of services would have construed the regulation—the court should construe it to be in keeping with a goal of Medicare to reduce waste, fraud, and abuse.

The Medlocks argue that the context, history, and prior judicial interpretation of 18 U.S.C. § 1035 "indicate that [the false] statements must be material to . . . Medicare," not merely to a prudent person. Appellant Woody Medlock Br. 19. Even if the Medlocks are correct, this argument is irrelevant. As discussed above, their fraudulent statements *were* material to Medicare. Any error, therefore, was harmless. The materiality argument does not require reversal of their convictions as a matter of law.

**B**

Woody Medlock asked that the court instruct the jury that the materiality requirement of the health-care fraud counts of the indictment required a finding that his misrepresentations would have defrauded *Medicare*, rather than a merely prudent person. The district court rejected his proposed jury instructions. Neither counsel for Woody Medlock nor for Kathy Medlock specifically objected to the ultimate jury instructions given.[6] So the court did not know that they objected to the lack of these particular jury instructions.

Appellants challenging a jury instruction to which they did not object at trial must clear a very high bar. "Failure to object" "to a failure to give a requested instruction" by "inform[ing] the court of the specific objection and the grounds for [it]" "precludes appellate review, except"

---

[6]After rejecting Woody Medlock's proposed jury instruction, the court proposed a different instruction. After the government objected to that new instruction, the court offered to take it out entirely. In response to the offer, Woody Medlock's counsel said: "I take it . . . that the government does not oppose to [*sic*] the court's proposed jury instruction not being given. We are in agreement with that which would mean that this instruction would come out. . . . And I believe that that [*sic*] from on behalf of Woody Medlock, Senior satisfied [*sic*] with the jury instructions." Counsel for Kathy Medlock, having earlier "adopt[ed]" the "position" of counsel for Woody Medlock's about the proposed jury instruction, said nothing in response to the court's proposal or the court's removal of the instruction altogether after the government and counsel for Woody Medlock objected.

if it was "[a] plain error that affects substantial rights." Fed. R. Crim. P. 30(d), 52(b). "Plain error" is one that is "clear" or "obvious." *United States v. Olano*, 507 U.S. 725, 734 (1993).

As we have explained, "[i]n the context of challenges to jury instructions, plain error requires a finding that, taken as a whole, the jury instructions were so clearly erroneous as to likely produce a grave miscarriage of justice." *United States v. Semrau*, 693 F.3d 510, 528 (6th Cir. 2012) (internal quotation marks and citations omitted). Because the Medlocks failed to challenge the jury instructions the district court ultimately gave, it would be proper for us to reverse only "if the instructions, viewed as a whole, were confusing, misleading, or prejudicial, *and* the error seriously affected the fairness, integrity, or public reputation of the judicial proceedings . . . ." *Ibid.* (emphasis added).

Here, the error did not confuse, mislead, or prejudice the jury because, as we have discussed above, the government produced evidence at trial that the Medlocks' actions *were* material to *Medicare*'s decision. Nor, despite the Medlocks' protestations to the contrary, did the government conflate falsity with materiality. We decline to reverse the district court's jury instructions.

**IV**

The evidence suffices to support the conviction of each Medlock and the court's refusal to server did not prejudice Woody Medlock.

**A**

A "rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979). "In reviewing the sufficiency of the evidence, this court must view the evidence in the light most favorable to the prosecution. A defendant faces a very heavy burden in challenging the sufficiency of the evidence . . . ." *United States v. Hunt*, 521 F.3d 636, 645–48 (6th Cir. 2008) (regarding health-care fraud and related charge) (citation omitted). The evidence sufficed for a rational trier of fact to find, beyond a reasonable doubt, both Woody and Kathy Medlock guilty of the essential elements of the crimes charged (except for aggravated identity theft, the convictions for which we have reversed):

(1) making false statements to Medicare,

(2) health-care fraud,

(3) wire fraud, and

(4) conspiracy to defraud Medicare and make false statements: an agreement, tacit or explicit.

We consider each in turn.

To convict the Medlocks of making false statements to Medicare, the government needed to prove that they knowingly made false statements or representations in connection with delivery of or payment for health-care benefits in a matter involving Medicare. The government showed that Woody and Kathy Medlock both did so, for example, by signing or directing employees to sign run tickets that said patients were on stretchers when they were not.

To convict the Medlocks of health-care fraud, the government needed to put on evidence that Woody and Kathy Medlock knowingly devised a scheme or artifice to defraud a health-care benefit program in connection with delivery of or payment for health-care benefits, that they executed the same, and that they did so with an intent to defraud. The government demonstrated that Woody Medlock knew of the scheme and acted in furtherance of it, e.g., by signing Medicare provider forms. And the government showed that Kathy Medlock was in charge of the billing office, and directed employees to further the scheme.

The elements of the health-care-fraud charge satisfy the wire-fraud charge, except for the use of interstate wire communications in furtherance of the scheme to defraud. The government showed that the government paid MAS through wire transfers.

Finally, to prove the conspiracy charge, the government needed to put on evidence of an agreement, tacit or explicit. The government's evidence of actual fraud, as well as of Woody Medlock's and Kathy Medlock's knowledge thereof and benefit therefrom, sufficed to evidence a tacit agreement to defraud Medicare.

B

Woody Medlock charges that it was error for the district court to deny his motion to sever either Count 42 of the indictment, pertaining only to Kathy Medlock, or, in the alternative, Kathy Medlock.

"The indictment . . . may charge a defendant in separate counts with 2 or more offenses if the offenses charged . . . are of . . . similar character, or are based on the same act or transaction, or are connected with or constitute parts of a common scheme or plan." Fed. R. Crim. P. 8(a). Similarly, "[t]he indictment . . . may charge 2 or more defendants if they are alleged to have participated in the same act or transaction, or in the same series of acts or transactions, constituting an offense or offenses. The defendants may be charged in one or more counts together or separately. All defendants need not be charged in each count." *Id.* 8(b).

To prevail on an appeal of a denial of a motion to sever, the "defendant must show compelling, specific, and actual prejudice . . . ." *United States v. Saadey*, 393 F.3d 669, 678 (6th Cir. 2005). This court must review the district court's decision not to sever for an abuse of discretion. *See also ibid.* (discussing the foremost circumstance relevant to motion to sever: the public interest in avoiding unnecessary litigation).

Woody Medlock argues that the government's presentation of the forgeries made at Kathy Medlock's direction prejudiced him, since they did not directly relate, in Woody Medlock's view, to the counts with which he was charged. But, as the district court correctly held, "the evidence [relating to the forgeries] is admissible as to the conspiracy count against all Defendants." This order did not abuse the district court's discretion. Although he briefs several reasons why the district court, within the rules, might have granted his motion, Woody Medlock fails to demonstrate "compelling, specific, and actual prejudice."

V

For the foregoing reasons, we REVERSE the Medlocks' convictions for aggravated identity theft and AFFIRM their other convictions.

**Addendum**

Our opinion affirms some convictions of Kathy Medlock and her husband and co-conspirator, Woody Medlock, and reverses certain convictions for aggravated identity theft. We amend our opinion to clarify that we affirm Kathy Medlock's conviction for aggravated identity theft on Count 42 of the underlying indictment.

While Kathy Medlock challenged her convictions on Counts 40 and 41 for aggravated identity theft, which convictions we have reversed, she did not challenge her conviction on Count 42. In Counts 40 and 41, the government relied upon the use of identification of patients who were actually transported by ambulance whose transport was unnecessary (and so not eligible for reimbursement). We hold that this use did not constitute aggravated identity theft. But in Count 42, the government relied on Kathy Medlock's forging a physician's signature and thus using his identity to secure reimbursement fraudulently for unnecessary ambulance transports. Our rationale for reversing the convictions on Counts 40 and 41 does not apply to the conviction on Count 42. For these reasons, we AFFIRM the judgment of the district court on Count 42.