RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)

File Name: 13a0315p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT
_____

UNITED STATES OF AMERICA,
          *Plaintiff-Appellee*,

      *v.*

DAVID EUGENE MILLER,
          *Defendant-Appellant.*

No. 12-6501

_____

Appeal from the United States District Court
for the Middle District of Tennessee at Nashville.
No. 3:11-cr-00034-1—Marvin E. Aspen, District Judge.

Argued: August 1, 2013

Decided and Filed: October 30, 2013

Before: CLAY, SUTTON, and GRIFFIN, Circuit Judges.

_____

## COUNSEL

**ARGUED:** Eli J. Richardson, BASS, BERRY & SIMS PLC, Nashville, Tennessee, for Appellant. Sandra G. Moses, UNITED STATES ATTORNEY'S OFFICE, Nashville, Tennessee, for Appellee. **ON BRIEF:** Eli J. Richardson, BASS, BERRY & SIMS PLC, Nashville, Tennessee, for Appellant. Sandra G. Moses, UNITED STATES ATTORNEY'S OFFICE, Nashville, Tennessee, for Appellee.

_____

## OPINION

_____

GRIFFIN, Circuit Judge. Defendant David Miller appeals his convictions by a jury of two counts of making false statements to a bank, in violation of 18 U.S.C. § 1014 (Counts One and Four), and two counts of aggravated identity theft, in violation of 18 U.S.C. § 1028A (Counts Two and Three). Miller argues that he is entitled to a reversal of all convictions because on Count One, he was subjected to a prejudicial variance at trial and the district court did not, sua sponte, give the jury a specific

1

unanimity instruction; on Counts Two and Three, he did not "use" a means of identification under § 1028A; and on Count Four, he did not make a "false statement" under § 1014.  For the reasons that follow, we affirm the conviction on Count One, reverse the remaining convictions, vacate Miller's sentence, and remand for further proceedings.

I.

Defendant Miller and his pastor William Wellons wanted to buy a parcel of real estate from a farmer as an investment property.  Wellons negotiated with the farmer and agreed to purchase the land for a little over $790,000.  The purchase was set to close on May 30, 2007.

Miller formed Fellowship Investors, LLC ("Fellowship") to purchase the land and recruited investors to purchase investment units in the company.  Miller calculated that Fellowship needed $900,000 in funding to cover the purchase price, costs related to acquiring the land, and expenses associated with Fellowship's management.  Eight investment units valued at $112,500 each were established to raise the needed funds. Miller and Wellons did not purchase an investment unit.  They nevertheless each acquired an ownership interest in Fellowship through their service to the company: Miller obtained a 19.5% interest because he was Fellowship's manager and Wellons obtained a 4.5% interest because he was Fellowship's secretary.  Ultimately, Miller secured $675,000 in investments before the closing date.

Because Miller had not raised $900,000 before the closing, he approached First Bank to obtain a loan.  Miller represented to Joe Stocker of First Bank that the David E. Miller Development Company, Inc. ("DEMCO"), one of Miller's real estate development companies,  needed a $337,500 loan to purchase a piece of real property. Miller told Stocker that he wanted to purchase the property with cash, but had run out of time to secure investors prior to closing and planned to pay off the loan within six months with investor funds.  First Bank agreed to loan $337,500 to DEMCO, with the property that Fellowship was going to acquire pledged as collateral.

Because DEMCO pledged Fellowship's property as collateral, First Bank required a written resolution from the members of Fellowship showing that they had authorized DEMCO to take such action. On May 24, 2007, First Bank sent a letter to the closing attorneys requesting that such a resolution be prepared before closing. The closing attorneys prepared a resolution, but it omitted a clause whereby the members of Fellowship specifically authorized DEMCO to pledge Fellowship property as collateral. First Bank supplied the necessary language, and the closing attorneys updated the resolution.

On May 25, 2007, the closing attorneys sent the updated resolution to First Bank, Wellons, and Miller's assistant for review. Wellons noticed that it was still incomplete because it did not list all members of Fellowship. He contacted Miller for the member list because he did not have that information. After Miller supplied Wellons with the names of all Fellowship members, Wellons handwrote those names on the updated resolution, signed it as Fellowship's secretary, and faxed it to the closing attorneys.

The Fellowship resolution contained two false statements: (1) that all Fellowship members were present at a meeting, and (2) that at this nonexistent meeting, they unanimously voted to allow the property to be pledged as collateral for a $337,500 loan to DEMCO. When Wellons signed the resolution, he did not know these statements were false because he thought that Miller had spoken to all members of Fellowship about the DEMCO loan and that they all agreed to allow DEMCO to pledge Fellowship property as collateral. In truth, Fellowship's members, other than Miller and Wellons, believed that the property was being purchased free and clear of any encumbrances and they did not agree, nor would they have agreed if asked, to the property being pledged as collateral.

On May 30, 2007, the closing attorneys closed both Fellowship's purchase of the property and First Bank's loan to DEMCO. As Fellowship's "Authorized Signer" at the closing, Miller executed two agreements: (1) a Deed of Trust granting First Bank a security interest in the property and (2) a Multipurpose Note and Security Agreement, which included a Third Party Agreement pledging the property as collateral for

DEMCO's loan (the "Note"). Because Miller had collected $675,000 from Fellowship's investors and $337,500 from First Bank, for a total of $1,012,500, he obtained $112,500 from the loan over and above the $900,000 that he told investors was needed to purchase the property. After the closing, $146,956.75 remained in Fellowship's account.[1]

A few months later, First Bank conducted a review of the loan file and discovered that it did not contain a copy of the Fellowship resolution signed by both Wellons and Miller. First Bank eventually obtained from the closing attorneys a copy of the resolution, which had a heading indicating that it had been faxed from DEMCO on July 23, 2007. Miller does not deny that his signature is on that resolution or that First Bank required this resolution to close the loan. First Bank also required Miller to re-sign the Third Party Agreement in the Note on August 27, 2007, as Fellowship's "Manager," rather than its "Authorized Signer," so that all documents were consistent with Fellowship's Operating Agreement.

By August 2008, Miller had exchanged all of his ownership interests in Fellowship for satisfactions of debt from various creditors who were not involved with the Fellowship investment. Despite having no ownership interest in Fellowship, on August 5, 2008, Miller modified and renewed the DEMCO loan with First Bank. The modification and renewal agreement referenced the agreements Miller executed on May 30, 2007.

In July 2009, Miller advised Fellowship's member investors for the first time that he had taken out a $337,500 loan to pay for his investment in Fellowship and that Fellowship's property secured this "personal loan." Three months later, law enforcement interviewed Miller regarding the Fellowship investment. Miller admitted he obtained a bank loan to fund his portion of the investment. Questioned about the resolution which authorized him to pledge Fellowship property as collateral for his loan, Miller stated that it was causing him "misery and grief among the fellow investors" and

---

[1]The day after the closing, Miller wrote a $112,500 check on Fellowship's account to a DEMCO account. Miller controlled that account, and it was unrelated to Fellowship's investment. From the DEMCO account, Miller then disbursed the $112,500 by writing a $45,000 check to himself and two checks in the amounts of $60,750 and $6,800 toward other business ventures unrelated to Fellowship.

that its existence was a "mystery." He admitted to providing the resolution to the bank but later denied knowledge of the document and continued to state it was a mystery. Miller also acknowledged that his failure to tell Fellowship investors about the mortgage was a "huge slip-up."

On March 29, 2012, the government charged Miller in a second superseding indictment with two counts of making false statements to a bank (Counts One and Four), in violation of 18 U.S.C. § 1014, and two counts of aggravated identity theft (Counts Two and Three), in violation of 18 U.S.C. § 1028A. A jury found Miller guilty on all counts after a three-day trial. The district court sentenced Miller to twenty-one months of imprisonment on the false statement convictions, to run concurrently, and twenty-four months on the aggravated identity theft convictions, to run concurrently as to each other but consecutively as to the false statement convictions, for a total of forty-five months of imprisonment. The court also sentenced Miller to two years of supervised release and ordered him to forfeit $337,500. Miller timely appealed.

## II.

Miller first argues that his conviction on Count One must be reversed due to a prejudicial variance regarding the date he made the false statement and, alternatively, because the district court did not, sua sponte, give the jury a specific unanimity instruction pertaining to the making of the false statement. We address each argument separately.

## A.

Miller claims that a prejudicial variance occurred below because, although Count One charged that "on or about May 30, 2007," he made a single false statement to First Bank, i.e., that he had the authority to pledge Fellowship's property as collateral for DEMCO's loan, the government presented evidence that Miller made this false

statement in six different ways on four different dates.[2]  The government responds that there was no variance because only one falsehood was alleged and proved at trial—that Miller falsely represented to First Bank, on three separate occasions, that he had the authority to pledge Fellowship's property as collateral for DEMCO's loan.[3]

In general, we review the record de novo to determine whether a variance has occurred.  *United States v. Robinson*, 547 F.3d 632, 642 (6th Cir. 2008).  However, where the issue is raised for the first time on appeal—as is the case here—we are limited to plain-error review.  *United States v. Kuehne*, 547 F.3d 667, 682 (6th Cir. 2008).  "To establish plain error, there must be (1) error, (2) that is plain, (3) that affects substantial rights.  If all of these requirements are met, [we] may then exercise [our] discretion to notice a forfeited error, but only if (4) the error seriously affects the fairness, integrity, or public reputation of judicial proceedings."  *Id.* (internal quotation marks and citation omitted).  "[T]he plain error doctrine is to be used sparingly, only in exceptional circumstances, and solely to avoid a miscarriage of justice."  *United States v. Phillips*, 516 F.3d 479, 487 (6th Cir. 2008) (internal quotation marks and citation omitted).

A variance is a violation of a criminal defendant's Sixth Amendment right "'to be informed of the nature and cause of the accusation.'"  *United States v. Nixon*, 694 F.3d 623, 637 (6th Cir. 2012) (quoting U.S. Const. amend. VI.).  "[It] occurs when 'the charging terms of the indictment are unchanged, but the evidence at trial proves facts materially different from those alleged in the indictment.'"  *United States v. Beals*, 698 F.3d 248, 258 (6th Cir. 2012) (quoting *United States v. Swafford*, 512 F.3d 833, 841 (6th Cir. 2008)).  A variance between the allegations in the indictment and trial proofs is not reversible error unless "the defendant shows prejudice to his ability to defend

---

[2]According to Miller, the "six different ways on four different dates" are as follows:  (1) on May 25, 2007, by causing Wellons to fax the Fellowship resolution to the closing attorneys; (2) on May 30, 2007, by submitting some version of the Fellowship resolution at the closing; (3) on May 30, 2007, by signing the Note at the closing; (4) on May 30, 2007, by signing the Deed of Trust at the closing; (5) on July 23, 2007, by faxing to the closing attorney a copy of the Fellowship resolution that Miller had signed; and (6) on August 27, 2007, by re-signing the Note.

[3]According to the government, the "three separate occasions" are as follows:  (1) orally to Stocker when Miller applied for DEMCO's loan; (2) in the Fellowship resolution; and (3) in the Note and the Deed of Trust.

himself at trial, to the general fairness of the trial, or to the indictment's sufficiency to bar subsequent prosecutions." *United States v. Beasley*, 583 F.3d 384, 392 (6th Cir. 2009) (internal quotation marks and citation omitted). To obtain a reversal of a conviction based on a variance, the defendant carries the burden of proving both that a variance occurred and that it was prejudicial. *United States v. Hynes*, 467 F.3d 951, 962 (6th Cir. 2006). In this case, Miller has not carried his burden of showing either requirement.

First, there was no material difference between the crime alleged and the facts proffered. Count One charged: "On or about May 30, 2007 . . . [Miller] . . . knowingly made a material false statement for the purpose of influencing the action of First Bank . . . in connection with a loan in that [Miller] represented to First Bank that he had the authorization of [Fellowship] members to pledge real property as collateral for the loan, when in truth and in fact, as [Miller] well knew, he did not have authority from each of the [Fellowship] members to pledge the real property." The evidence at trial showed that on May 30, 2007, on behalf of Fellowship, Miller signed the Note, granting First Bank a security interest in Fellowship's property, and the Deed of Trust, pledging Fellowship's property as security for the DEMCO loan. By signing these documents, Miller falsely represented to First Bank that he had the authority to act on behalf of Fellowship and pledge its property as collateral for DEMCO's loan. To establish that Miller's representations were actually false, the government introduced evidence surrounding the origins of the Fellowship resolution and Miller's July 23, 2007, post-closing endorsement of that resolution, which falsely claimed that Fellowship's members had authorized Miller to encumber Fellowship's property for DEMCO's benefit. The evidence of Miller's conduct leading up to and following the closing was not presented as separate § 1014 violations. Rather, the government offered this evidence to provide the necessary context for other evidence in the record[4] and to corroborate its charge that "on or about May 30, 2007," Miller knowingly and intentionally made a false statement

---

[4]For example, that Miller signed the Note a second time on August 27, 2007, is not evidence of a new false statement. The government presented this evidence to explain to the jury why Miller signed this document on two separate dates.

"in connection with a loan" to First Bank. Because the trial proofs substantially corresponded to the allegations in Count One, there was no variance. *See Beals*, 698 F.3d at 258–59; *United States v. Peatross*, 377 F. App'x 477, 486–87 (6th Cir. 2010).

Second, even assuming there was a variance, Miller has not demonstrated prejudice. The government's trial brief made clear its theory of the case that the Fellowship resolution, the Deed of Trust, and the Note all contained the same false statement charged in Count One. The government also advised Miller that it would be introducing evidence explaining the origins and meanings of these documents. Under these circumstances, Miller was not taken by surprise by the evidence offered at trial and was able to prepare and present a defense. *See Beasley*, 583 F.3d at 392. Further, the parties agree that Miller faces no double jeopardy threat because the record is sufficiently detailed to protect him against a subsequent prosecution for the same offense. *See id.* Accordingly, Miller has failed to establish prejudice, even assuming a variance occurred.

B.

Alternatively, Miller argues that his conviction on Count One should be reversed because the district court plainly erred by not sua sponte giving the jury a specific unanimity instruction as to the making of the false statement. He contends that because the government presented six potential "makings" of false statements to the jury, there was a possibility that different jurors would vote to convict based on different "makings" of a false statement. Therefore, because the jury had to be unanimous as to which statement was the basis for convicting Miller, the district court should have given a specific unanimity instruction, notwithstanding the fact that neither party requested one. The government responds that the instruction was unnecessary because the charge and evidence were not complex, there was no variance, and there was no tangible indication of jury confusion.

Where a defendant did not request a specific unanimity instruction below—as is the case here—we are limited to plain-error review. *United States v. Thomas*, 74 F.3d

701, 712 (6th Cir. 1996).  Under this standard, "[w]e consider whether the instructions, when taken as a whole, were so clearly wrong as to produce a grave miscarriage of justice." *United States v. Sanderson*, 966 F.2d 184, 187 (6th Cir. 1992). "[A]n improper jury instruction will rarely justify reversal of a criminal conviction when no objection has been made at trial, . . . and an omitted or incomplete instruction is even less likely to justify reversal, since such an instruction is not as prejudicial as a misstatement of the law." *United States v. Rayborn*, 491 F.3d 513, 521 (6th Cir. 2007) (internal quotation marks and citation omitted).

When considering whether a specific unanimity instruction is necessary, the general rule is that:

> [O]nly a general unanimity instruction is required even where an indictment count provides multiple factual bases under which a conviction could rest, unless: "(1) the nature of the evidence is exceptionally complex or the alternative specifications are contradictory or only marginally related to each other; or (2) there is a variance between indictment and proof at trial; or (3) there is tangible indication of jury confusion, as when the jury has asked questions or the court has given regular or supplementary instructions that create a significant risk of nonunanimity."

*United States v. Damra*, 621 F.3d 474, 504–05 (6th Cir. 2010) (quoting *United States v. Duncan*, 850 F.2d 1104, 1113–14 (6th Cir. 1988)).

None of the three reasons justifying an exception to the general rule are present in Miller's case.  First, the nature of the evidence was not exceptionally complex.  The multiple documents in this case all contain substantially similar manifestations of the singular false statement charged. These documents are not contradictory or marginally related to each other; they were all presented in connection with the loan closing. Second, there was no variance.  Third, the record contains no tangible indication of juror confusion.  Miller's defense was simple.  He conceded that while he would have known that any statement claiming he had authority to pledge Fellowship property was false, he did not knowingly make such a claim, i.e. he lacked mens rea, because he believed that he was pledging *his ownership interest* in Fellowship, rather than *Fellowship's*

*property*.  There was no risk of jury confusion because if they rejected the defense to either the Fellowship resolution, the Note, or the Deed of Trust, the jury necessarily rejected it as to all three because each document contained some iteration of the same false statement.  *Accord United States v. Algee*, 599 F.3d 506, 514 (6th Cir. 2010).  Moreover, Miller offers no evidence of actual juror confusion (such as a mid-deliberation note from the jury, *see Duncan*, 850 F.2d at 1105), and his creative speculation as to how a juror *might* be confused does not establish "a genuine risk that the jury is confused or that a conviction may occur as the result of different jurors concluding that a defendant committed different acts."  *Damra*, 621 F.3d at 505 (internal quotation marks and citation omitted).  On this record, the district court did not plainly err by omitting an instruction that neither party requested.  We therefore affirm Miller's conviction on Count One.

III.

Miller next argues that his convictions on Counts Two and Three for aggravated identity theft must be reversed because, as a matter of law, he did not "use" another person's name as alleged in those counts.  The government's prosecution theory was that Miller "used" the names of Fellowship members R. Mark Foster ("Individual A" in Count Two) and Michael Lipson ("Individual B" in Count Three) by including their names in the Fellowship resolution which falsely stated that they were present at a meeting of all Fellowship members in which they voted to allow Miller, as Fellowship's managing member, to pledge Fellowship property for the DEMCO loan.  Miller asserts that 18 U.S.C. § 1028A does not criminalize this conduct because he only lied about what Foster and Lipson did, but he did not "use" their names or identities.  The government responds that the crux of these offenses is not that Miller claimed that Foster and Lipson did something they in fact did not do, but rather that Miller "used" their names to fraudulently obtain a loan from First Bank by misrepresenting that he had the authority to act on behalf of those individuals.

Whether a criminal statute applies to the proven conduct of the defendant is an issue of statutory interpretation that we review de novo.  *United States v. Lumbard*, 706

F.3d 716, 720 (6th Cir. 2013).  Titled "Aggravated identity theft," 18 U.S.C. § 1028A provides:  "Whoever, during and in relation to any felony violation enumerated in subsection (c), knowingly transfers, possesses, or uses, without lawful authority, a means of identification of another person shall, in addition to the punishment provided for such felony, be sentenced to a term of imprisonment of 2 years."  18 U.S.C. § 1028A(a)(1).  Subsection (c) includes making a false statement to a bank among the enumerated offenses, § 1028A(c)(4), and "means of identification" is a defined term that includes a person's name, § 1028(d)(7).  Substituting the facts of this case into the statute's variables, Miller committed aggravated identify theft if he knowingly used Foster's and Lipson's names, without lawful authority, when he made the false statement to First Bank that they had authorized him to pledge Fellowship property as collateral for DEMCO's loan.

In this case, the parties dispute only whether Miller "used" Lipson's and Foster's names under the statute.  The following well-established principles guide our construction of "uses":

> The language of the statute is the starting point for interpretation, and it should also be the ending point if the plain meaning of that language is clear.  However, this court also looks to the language and design of the statute as a whole in interpreting the plain meaning of statutory language.  Finally, we may look to the legislative history of a statute if the statutory language is unclear.  If the statute remains ambiguous after consideration of its plain meaning, structure, and legislative history, we apply the rule of lenity in favor of criminal defendants.

*United States v. Choice*, 201 F.3d 837, 840 (6th Cir. 2000) (internal quotation marks and citations omitted).

Because "uses" is an undefined term, we "construe it in accord with its ordinary or natural meaning." *Smith v. United States*, 508 U.S. 223, 228 (1993).  This "'everyday meaning'" reveals itself in "phraseology that strikes the ear as 'both reasonable and normal[.]'" *Watson v. United States*, 552 U.S. 74, 79 (2007) (quoting *Smith*, 508 U.S. at 228, 230).  Defined in isolation from its statutory context, the dictionary meaning of the word "use" is "'[t]o convert to one's service,' 'to employ,' 'to avail oneself of,' and

'to carry out a purpose or action by means of.'" *Bailey v. United States*, 516 U.S. 137, 145 (1995) (quoting *Smith*, 508 U.S. at 228–29).  The Supreme Court has noted the "interpretational difficulties" that the word "use" poses because of its frequent inclusion in statutory text and the numerous "different meanings attributable to it." *Id.* at 143. That is why "[w]e consider not only the bare meaning of the word but also its placement and purpose in the statutory scheme. [T]he meaning of statutory language, plain or not, depends on context." *Id.* at 145 (internal quotation marks and citation omitted); *Choice*, 201 F.3d at 840.

Under the circumstances of this case, the meaning of "uses" is ambiguous because the parties advance equally reasonable interpretations of that term.  On one hand, relying upon dictionary definitions, the government argues that Miller "used" Foster's and Lipson's names within the ordinary meaning of that verb in that he employed their names to his benefit, converted their names to his service, and intentionally availed himself of their names in order to falsely manufacture authority to encumber Fellowship property for DEMCO's benefit. *See Bailey*, 516 U.S. at 145.  This reasonable interpretation flows from the plain language of the statute, which arguably criminalizes the generic "use" of another person's name when making a false statement to a bank.  The government fully embraced this broad interpretation at oral argument, conceding that if there is *any* false statement about authority, which necessarily involves the "use" of someone's name, made in connection with a predicate offense under § 1028A(c), the government can *always* charge aggravated identity theft in addition to the underlying offense.

On the other hand, relying on statutory purpose, context, and an unpublished opinion from a district court in this circuit, Miller argues that one "uses" a person's name under the "aggravated identity theft" statute only if one either passes himself off as that person or acts on behalf of that person. *See United States v. Wilcox*, No. 1:09-cr-140, 2010 WL 55964, *7 (W.D. Mich. Jan. 4, 2010) (unpublished).  Miller acknowledges that although he may have lied about what Foster and Lipson did, he maintains that this conduct does not constitute "use" of their names because he did not steal or possess their

identities, impersonate them or pass himself off as one of them, act on their behalf,[5] or obtain anything of value in one of their names. In other words, he did not "use" Foster's and Lipson's names within the meaning of § 1028A by merely lying about what they did.

Two canons of statutory construction support Miller's interpretation: *noscitur a sociis* and *ejusdem generis*. The first canon instructs that "the meaning of an undefined term may be deduced from nearby words[,]" *United States v. Ossa-Gallegos*, 491 F.3d 537, 540 (6th Cir. 2007) (en banc) (internal quotation marks and citation omitted), and the second holds that "where general words follow specific words in a statutory enumeration, the general words are construed to embrace only objects similar in nature to those objects enumerated by the preceding specific words[,]" *United States v. Douglas*, 634 F.3d 852, 858 (6th Cir. 2011) (internal quotation marks and citation omitted). Applying those canons here, the broad, dictionary definition of "uses" is narrowed by its placement *near* and *after* "transfers" and "possesses," both of which are specific kinds of use. Therefore, Miller persuasively argues that the meaning of "uses" is not as expansive as the government suggests and that the term must have practical boundaries, particularly in cases such as this where the only "means of identification" used is a name. *Brown v. Gardner*, 513 U.S. 115, 118 (1994) ("Ambiguity is a creature not of definitional possibilities but of statutory context[.]"). Because the parties' competing interpretations of "uses" demonstrate that it is not entirely clear whether § 1028A criminalizes Miller's conduct, we find the statute ambiguous.

"When a plain reading leads to ambiguous or unreasonable results, [we] may look to legislative history to interpret a statute." *United States v. Vreeland*, 684 F.3d 653, 662 (6th Cir. 2012) (internal quotation marks and citations omitted); *Choice*, 201 F.3d at 840. Unfortunately, there is nothing in the legislative history to indicate conclusively that Congress intended § 1028A to cover defendants falsely claiming that other individuals did things that they actually did not do. Section 1028A was enacted

---

[5]Although Miller certainly acted on behalf of *Fellowship* when executing the Fellowship resolution and pledging Fellowship property, he never portrayed himself as acting on behalf of *Foster and Lipson*. In the resolution, Miller misrepresented only that they had voted to give him authority to act on behalf of Fellowship. Miller lying about whether Foster and Lipson gave him authority to act on behalf of the company is conceptually distinct from Miller acting on their behalf.

in 2004 as the Identity Theft Penalty Enhancement Act.  *See* Pub. L. 108-275, § 2, 118 Stat. 831.  The relevant House Report broadly states that § 1028A "is intended to reduce the incidence of identity theft and fraud and address the most serious criminals by providing stronger penalties for those who would commit such crimes in furtherance of other more serious crimes." H.R. Rep. No. 108-528, 785 (2004).  This report is brief and does not address the exact interpretive question presented.  However, we note that Miller's case is readily distinguishable from all eight of the identity theft cases offered in the report as examples of why Congress needed to enact a two-year mandatory minimum sentence of imprisonment that runs consecutive to a predicate offense for certain kinds of identity theft crimes.  *Id.* at 781–82.  Nevertheless, even if the single House Report suggests that § 1028A does not reach Miller's conduct, the legislative history, as a whole, does not resolve the ambiguity in either party's favor.

Confronted with two reasonable interpretations of  "uses" and no conclusive guidance from the legislative history or case law (this is an issue of first impression), we apply the rule of lenity, which "requires ambiguous criminal laws to be interpreted in favor of the defendants subjected to them."  *Beals*, 698 F.3d at 273 (internal quotation marks and citation omitted); *Choice*, 201 F.3d at 840.  "When there are two rational readings of a criminal statute, one harsher than the other, the rule of lenity tells us that we are to choose the harsher only when Congress has spoken in clear and definite language." *United States v. Brock*, 501 F.3d 762, 768 (6th Cir. 2007) (internal quotation marks and citation omitted).  Nothing inherent in the term "uses," its placement in the text of § 1028A, or the statute's legislative history clearly and definitely indicates that the term, as applied to the names of persons, is broad enough to reach the mere act of saying that the persons did something they in fact did not do.  The ambiguity arising from the attempted application of § 1028A to the facts of this case fits squarely within the rule of lenity, and we resolve the uncertainty in Miller's favor.  *See United States v. Ford*, 560 F.3d 420, 425 (6th Cir. 2009) ("When ambiguity clouds the meaning of a criminal statute, the tie must go to the defendant.") (internal quotation marks and citation omitted).

Therefore, as a matter of law, Miller did not "use" a means of identification within the meaning of § 1028A by signing a document in his own name which falsely stated that Foster and Lipson gave him authority, as Fellowship's managing member, to act on behalf of Fellowship and pledge its property for the DEMCO loan. Accordingly, we reverse Miller's convictions on Counts Two and Three.

IV.

Miller's final argument is that his conviction on Count Four for violating 18 U.S.C. § 1014 must be reversed because, as a matter of law, he did not make the "false statement" on or about August 5, 2008, that he "had authorization, as managing member of [Fellowship], to pledge real property as collateral for the [DEMCO] loan" as charged in the indictment. Miller posits that what he did on August 5, 2008—modifying and renewing DEMCO's loan—was not tantamount to making a "false statement" that he had the authority to pledge Fellowship's property as collateral for the DEMCO loan. The government responds that a § 1014 violation can occur when a bank relies upon prior false statements for the purpose of influencing the bank in subsequent, multiple loan transactions. And here, since Miller was clearly on notice that First Bank was relying on the previous false statement that he had authority to pledge the collateral for the loan in renewing that loan, Miller was properly convicted of making a false statement in relation to the renewal of the loan.

Like the issue discussed in Part III *supra*, Miller's argument here is one of statutory interpretation that we review de novo. *Lumbard*, 706 F. 3d at 720. "Section 1014 prohibits individuals from 'knowingly mak[ing] any false statement or report' for the purpose of influencing a lending institution." *United States v. Kurlemann*, Nos. 11–3394, 11–3544, 11–3397, ___ F.3d ___, ___, 2013 WL 5616757, *2 (6th Cir. Apr. 2, 2013) (quoting 18 U.S.C. § 1014). "Whether made orally or offered through a written report, a 'false statement' must be that—a statement, a 'factual assertion' capable of confirmation or contradiction." *Id.* at *3 (quoting *Williams v. United States*, 458 U.S. 279, 284 (1982)). Section 1014 prohibits only "'false statements[;]' [i]t does not generally cover misleading statements, false pretenses, schemes, trickery, fraud or other

types of deception." *Id.* "[A] false-statement prosecution under § 1014 cannot generally be premised on implied representations. It must turn on true-or-false representations later shown to be false." *Id.* at *4.

The government claims that Miller made the false statement that he had authority to pledge Fellowship's property by renewing DEMCO's loan in August 2008. As evidence of this statement, the government points to: (1) the "Recitals" section of the modification and renewal agreement, which contains a passing reference to the Deed of Trust and the Note, and (2) the "Limited Modification" section of the agreement, which states that "[except as set forth in the renewal agreement] the terms, conditions, and provisions of the Note and Collateral shall not be affected" and "the original terms of the Note and Deed of Trust shall continue in full force." The government's theory is that by signing a renewal agreement that incorporates by reference previous documents which contained the false statement that Miller had authority to pledge Fellowship property to DEMCO, Miller has made a new false statement. This prosecution theory is not viable in light of *Kurlemann*.

Miller did not make a "false statement" under § 1014 by signing the modification and renewal agreement because the document does not contain the false "factual assertion" that he had authority to pledge Fellowship property. *Id.* at *3. The "Recitals" and "Limited Modification" sections of the agreement say nothing about this authority. Rather, they speak only to the legal effectiveness of the previously executed documents, not to any factual assertions later shown to be false. In other words, Miller did not reaffirm or newly assert that he had authority to pledge Fellowship property; he simply agreed that he must bear the legal consequences of having signed the underlying documents, whether the representations contained therein were true or not. Although by renewing DEMCO's loan Miller is certainly culpable of "misleading statements, false pretenses, schemes, trickery, [and] fraud" regarding his authority, and even if we agree with the government that he made "implied representations" that he had authority, the modification and renewal agreement simply do not contain any "false statements." *Id.* at *3-4. Accordingly, we reverse Miller's conviction on Count Four.

V.

For these reasons, we affirm Miller's conviction on Count One, reverse his convictions on Counts Two, Three and Four, vacate his sentence, and remand for further proceedings consistent with this opinion.