19-1486-cr
*United States v. Dumitru*

# In the
# United States Court of Appeals
## for the Second Circuit

AUGUST TERM 2019

No. 19-1486-cr

UNITED STATES OF AMERICA,
*Appellee,*

v.

ANDREEA DUMITRU, AKA ANDREEA DUMITRU PARCALABOIU,
*Defendant-Appellant.*

On Appeal from the United States District Court
for the Southern District of New York

ARGUED: MAY 12, 2020
DECIDED: MARCH 22, 2021

Before: NEWMAN and CABRANES, *Circuit Judges.*[1]

---

Defendant-appellant Andreea Dumitru ("Dumitru") appeals from a judgment of the United States District Court for the Southern District of New York (Lewis A. Kaplan, *Judge*) convicting her of asylum fraud in violation of 18 U.S.C. § 1546(a), making false statements in violation of 18 U.S.C. §§ 1001(a)(2) and (3), and aggravated identity theft in violation of 18 U.S.C. § 1028A(a)(1). This case presents two questions: (1) whether the evidence at trial was sufficient to sustain a conviction for aggravated identity theft, even under the narrow view of the aggravated identity theft statute promoted by Dumitru; and (2) whether the District Court erred in applying a sentencing enhancement for the involvement of 100 or more documents in the relevant offense. We answer the first question in the affirmative and the second question in the negative and **AFFIRM** the judgment of the District Court.

Judge Newman concurs in a separate opinion.

---

SUSAN C. WOLFE, Law Office of Susan C. Wolfe, New York, NY (Diane M. Fischer, Brooklyn, NY, *on the brief*), *for Appellant*.

---

[1] Judge Hall, originally assigned to the panel, was unavailable to participate in the consideration of this matter and died on March 11, 2021. The two remaining members of the panel, who are in agreement, have decided this case in accordance with Second Circuit Internal Operating Procedure E(b). *See* 28 U.S.C. § 46(d); *cf. United States v. Desimone*, 140 F.3d 457, 458 (2d Cir. 1998).

ROBERT B. SOBELMAN (Nicholas W. Chiuchiolo, Alison G. Moe, David Abramowicz, Assistant United States Attorneys *on the brief*), *for* Audrey Strauss, United States Attorney, Southern District of New York, New York, NY, *for Appellee.*

PER CURIAM:

Appellant Andreea Dumitru ("Dumitru") was convicted, following a jury trial, of one count each of: asylum fraud in violation of 18 U.S.C. § 1546(a), making false statements in violation of 18 U.S.C. §§ 1001(a)(2) and (3), and aggravated identity theft in violation of 18 U.S.C. § 1028A(a)(1). Dumitru was then sentenced to a below-guidelines aggregate term of imprisonment of 60 months, to be followed by one year of supervised release. On appeal, she challenges her conviction for aggravated identity theft and the application of a sentencing enhancement. For the reasons stated herein, we **AFFIRM** the judgment of the United States District Court for the Southern District of New York (Lewis A. Kaplan, *Judge*).

3

## I. BACKGROUND

Dumitru owned and operated a law practice, Andreea Dumitru & Associates, in Sunnyside, Queens. Over time, Dumitru's practice grew to include an increasing number of immigration cases, including applications for asylum.

Between 2012 and 2017, Dumitru submitted applications to the United States Citizenship and Immigration Services ("USCIS"), an agency of the United States Department of Homeland Security, seeking asylum on behalf of her clients. To be eligible for asylum, an individual must demonstrate that he was persecuted in, or has a well-founded fear of persecution if he is returned to, his former country "on account of race, religion, nationality, membership in a particular social group, or political opinion."[2] In order to apply for asylum, an individual must submit Form I-589 to USCIS, which requires a

---

[2] 8 U.S.C. §§ 1101(a)(42), 1158(b)(1)(B)(i).

detailed and specific account of the basis for the individual's asylum request.[3] The basis for seeking asylum is stated primarily in a narrative section in which the applicant "is asked to explain in detail . . . information about [his] experiences of past harm and fears for the future."[4] Form I-589 may be prepared by someone other than the applicant if the preparer and the applicant both sign the application under penalty of perjury.

On September 13, 2018, the Government filed a superseding indictment charging Dumitru with: (1) committing asylum fraud by submitting asylum applications on behalf of clients in which she knowingly made false statements and representations, in violation of 18 U.S.C. § 1546(a) and 18 U.S.C. § 2; (2) knowingly and willfully making false statements and representations to federal agencies in the course of representing her asylum clients, in violation of 18 U.S.C.

---

[3] 8 C.F.R. § 208.3(a).

[4] Supp. App'x at 4.

§§ 1001(a)(2)-(3) and 18 U.S.C. § 2; and (3) committing aggravated identity theft by using identifying information of asylum applicants during and in relation to the first two charged crimes, in violation of 18 U.S.C. § 1028A(a)(1).

At a jury trial, one of Dumitru's former employees, Alexandra Miron ("Miron"), estimated that in 2015, 2016, and 2017, Dumitru filed "anywhere from [fifty] to a hundred" asylum applications per year.[5] In general, these asylum claims were based on the persecution of members of the Roma ethnic group in Romania. Miron testified that in some applications made on behalf of Dumitru's asylum clients, Dumitru directed her staff to recycle narrative sections used in prior clients' applications and to prepare and submit accompanying affidavits using information pulled from prior clients' applications. The applications using recycled narratives therefore did not include a

---

[5] App'x at 39.

basis for asylum that was individual or specific to the particular applicant. Miron testified that she filled out "probably over a hundred" such applications at Dumitru's direction.[6] Additionally, a government investigator testified that he had reviewed 105 applications and found that 100 of the applications contained one or more of five "nearly identical" narratives of past persecution, categorized as: (1) broken school supplies; (2) bitten in police custody; (3) personally stopped by police; (4) beaten in factory; and (5) beaten outside bar in Bucharest.[7] At trial, the Government introduced two summary charts, admitted into evidence, detailing the prevalence of these five categories of narratives found in the applications.

Although the applications did not accurately convey the experiences of her clients, Dumitru, as preparer, attested that the applications were accurate based on her knowledge of the applicant's

---

[6] App'x at 44.

[7] App'x at 55–62, 83.

specific circumstances by signing her name under penalty of perjury or allowing her staff to sign her name. At Dumitru's direction, staff members also signed and notarized affidavits and applications on behalf of clients in the space designated for the client's signature, often without sending the application to the client for review before signing. Multiple former clients of Dumitru also testified at trial that they had not reviewed the applications submitted on their behalf prior to filing, that they did not sign the application or give anyone else permission to sign it for them, and that the applications contained inaccurate information. Two of Dumitru's clients testified that they were not Roma. A third, who identified as a member of the Roma ethnic group, testified that he had never discussed persecution he experienced in Romania with Dumitru or authorized her to apply for asylum on his behalf.

Miron testified that, once the asylum applications were completed, Dumitru would personally deliver them to an immigration

judge in Manhattan, often before a client had an opportunity to review the application. The filing of false asylum applications has serious collateral consequences—if an immigration judge finds that an application was deliberately fabricated, the applicant may be permanently barred from receiving any relief under the Immigration and Nationality Act.

At the close of the Government's case, Dumitru moved for a judgment of acquittal pursuant to Federal Rule of Criminal Procedure 29 on the grounds that there was insufficient evidence that she used her clients' identification without lawful authority and thus committed aggravated identity theft. The District Court denied the motion.

Dumitru subsequently sought a jury instruction for aggravated identity theft specifying that the Government had to prove, *inter alia*, that the defendant knew that the individual whose means of identification were improperly used did not consent to the use. The

District Court rejected this instruction and instead told the jury that, to find Dumitru guilty on the aggravated identity theft charge, the Government must prove that: (1) Dumitru knowingly used, transferred, or possessed another individual's means of identification (which could include a signature); (2) Dumitru did so during and in relation to one of the other crimes charged; and (3) Dumitru did so without lawful authority (which could include using a means of identification obtained with consent but for an unlawful purpose). The jury convicted Dumitru of all three charged counts.

Prior to sentencing, Dumitru challenged the guidelines calculations made by the United States Probation Office ("Probation"), arguing that the calculation accounted for sentencing enhancements for which there was insufficient evidence. Specifically, Dumitru argued that there was insufficient evidence presented at trial to demonstrate, by a preponderance of the evidence, that the crimes involved 100 or more fraudulent documents. Therefore, Dumitru

argued, a nine-level enhancement was not warranted, nor was Dumitru responsible for "otherwise extensive" criminal activity.[8] The District Court rejected Dumitru's challenges and sentenced her to below-guidelines concurrent terms of 36 months on the first two counts and a mandatory consecutive term of 24 months for the aggravated identity theft conviction, for a total term of imprisonment of 60 months.

This appeal followed.

## II.    DISCUSSION

On appeal, Dumitru contends, as before the District Court, that her conduct was legally insufficient to support a conviction for aggravated identity theft and that there was insufficient evidence to show that a nine-level enhancement for 100 or more fraudulent documents was warranted. She argues for the first time on appeal that

---

[8] App'x at 187–95.

the District Court should not have applied a nine-level enhancement to her Guidelines base offense level because a relevant application note precludes such an enhancement where, as here, a defendant is convicted of aggravated identity theft.

a. Aggravated Identity Theft Conviction

We review a challenge to the sufficiency of the evidence supporting a criminal conviction *de novo*.[9] If the evidence, "viewed in its totality and in the light most favorable to the Government, would permit any rational jury to find the essential elements of the crime beyond a reasonable doubt," we must affirm the conviction.[10]

The aggravated identity theft statute states, "Whoever, during and in relation to any [enumerated] felony violation . . . knowingly transfers, possesses, or uses, without lawful authority, a means of

---

[9] *See United States v. Geibel*, 369 F.3d 682, 689 (2d Cir. 2004).

[10] *Id.*

identification of another person shall . . . be sentenced to a term of imprisonment of 2 years" in addition to the punishment for the underlying felony.[11] A "means of identification" is defined broadly to include names.[12] Dumitru principally argues that her conduct, while fraudulent, does not fall under the "theft" proscribed by the statute because her use of clients' identifying information was merely incidental to the fraud. Because she "did not steal [another person's means of identification] or attempt to pass herself off as someone else" in completing and submitting her clients' fraudulent asylum applications, Dumitru argues that she did not "use" their identifying

---

[11] 18 U.S.C. § 1028A(a)(1).

[12] *Id.* § 1028(d)(7).

13

information in a manner that the aggravated identity theft statute contemplates or criminalizes.[13]

The aggravated identity theft statute is susceptible to multiple reasonable readings, causing uncertainty over the precise conduct this statute covers. Our sister circuits have interpreted the statute to avoid potentially overbroad reach. The Sixth Circuit, for example, has acknowledged the ambiguity of the statutory language "uses," but declined to read the statute so broadly that it would cover the mere listing of an individual's identifying information in a false writing.[14] That circuit held that neither a false attestation that a named individual gave the defendant permission to do something, nor the listing of another's identifying information in government reimbursement

---

[13] Appellant Br. 19.

[14] *See, e.g.*, *United States v. Miller*, 734 F.3d 530, 540–42 (6th Cir. 2013); *United States v. Medlock*, 792 F.3d 700, 705–07 (6th Cir. 2015).

forms containing false information, is sufficient to constitute a "use" of a means of identification prohibited by the statute.[15]

The First Circuit similarly held that there was insufficient evidence that a defendant "used" a means of identification where he issued prescriptions using a fraudulently obtained medical license to named patients.[16] In so doing, the First Circuit "read the term 'use' to require that the defendant attempt to pass him or herself off as another

---

[15] *Miller*, 734 F.3d at 540–42.

[16] *United States v. Berroa*, 856 F.3d 141, 155–57 (1st Cir. 2017).

person or purport to take some other action on another person's behalf."[17]

Also ambiguous is the reach of the statutory language "without lawful authority."[18] Dumitru argues that it is necessary to show that there is "another person" who has been victimized in order to prove that she acted "without lawful authority," and that this showing requires that the other person did not consent to the use of his identifying information.[19] In support, Dumitru points to a minority view articulated by the Seventh Circuit in *United States v. Spears*, which

---

[17] *Id.* at 156; *see also United States v. Hong*, 938 F.3d 1040, 1051 (9th Cir. 2019) (declining to find that the owner of massage and acupuncture clinics "use[d]" a means of identification where, in order to fraudulently qualify for Medicare reimbursement, he merely misrepresented the nature of treatments that patients received and did not "purport to take some other action on another person's behalf"); *cf. Miller*, 734 F.3d at 541 (distinguishing a defendant's listing identifying information of another from acting on that individual's behalf in analyzing whether that defendant committed aggravated identity theft).

[18] *But see United States v. Abdelshafi*, 592 F.3d 602, 608 (4th Cir. 2010) ("[T]he aggravated-identity-theft statute's use of the phrase 'without lawful authority' is 'broad and unambiguous.'" (citation omitted)).

[19] Appellant Br. 25-27.

held that the term "another person" in § 1028A "refer[s] to a person who did not consent to the use of the 'means of identification.'"[20] She independently asserts that "without lawful authority" must mean "without consent," because defining the term to mean "us[ing]" a means of identification "unlawfully or to commit a crime" would render the term meaningless in light of the mandate that aggravated identity theft occur in the context of an enumerated felony. Though this argument may have some intuitive appeal, it has been rejected by other circuits.[21]

We have not had occasion to determine the precise bounds of the aggravated identity theft statute, and we need not do so here

---

[20] 729 F.3d 753, 758 (7th Cir. 2013).

[21] *See, e.g.*, *Abdelshafi*, 592 F.3d at 609 ("The statute prohibits an individual's knowing use of another person's identifying information without a form of authorization recognized by law."); *United States v. Ozuna-Cabrera*, 663 F.3d 496, 498 (1st Cir. 2011) (rejecting argument that "without lawful authority" requires "that the means of identification be stolen, or otherwise taken without permission of the owner"); *United States v. Lumbard*, 706 F.3d 716, 725 (6th Cir. 2013) ("Accordingly, we conclude that the phrase 'without lawful authority' in § 1028A . . . includes cases where the defendant obtained the permission of the person whose

because Dumitru's actions would fall within those bounds even under a narrow view of the proscribed conduct. First, because Dumitru directed her staff to sign clients' names and used these forged signatures to falsely represent to authorities that her clients caused the relevant applications to be signed, she "purport[ed] to take some . . . action on another person's behalf," and thus used her clients' identifying information in a way prohibited by the statute.[22] Second, because there was ample testimony that clients did not give Dumitru their consent to file asylum applications on their behalf or direct her staff to sign their names, her conduct would be prohibited even if we

---

information the defendant misused."); *United States v. Reynolds*, 710 F.3d 434, 436 (D.C. Cir. 2013) ("[U]se without lawful authority easily encompasses situations in which a defendant gains access to identity information legitimately but then uses it illegitimately—in excess of the authority granted." (internal quotation marks and alterations omitted)); *United States v. Osuna-Alvarez*, 788 F.3d 1183, 1185 (9th Cir. 2015) ("This language clearly and unambiguously encompasses situations like the present, where an individual grants the defendant permission to possess his or her means of identification, but the defendant then proceeds to use the identification unlawfully."); *United States v. Mahmood*, 820 F.3d 177, 188 (5th Cir. 2016) ("[We] hold that § 1028A does not require actual theft or misappropriation of a person's means of identification.").

[22] *Berroa*, 856 F.3d at 156.

18

read the statute to require a showing that an individual did not consent to the use of his information. And we cannot agree that Dumitru's use of clients' identifying information—signatures forged at her direction attesting to the truth of the contents of immigration documents—was sufficiently "incidental" to Dumitru's criminal conduct as to render it outside the scope of the statute. Dumitru's sufficiency-of-the-evidence arguments as to her aggravated identity theft conviction therefore fail, and we affirm her conviction on the grounds that there was sufficient evidence to show that she had "used" a means of identification "without lawful authority."

### b. Nine-Level 100 Document Enhancement

Dumitru's argument that the District Court erred in applying an enhancement to her base offense level for filing at least 100 fraudulent applications is essentially a claim of procedural error.[23] Dumitru

---

[23] *See United States v. Cavera*, 550 F.3d 180, 190 (2d Cir. 2008) (*en banc*) ("A district court commits procedural error where it . . . makes a mistake in its

19

contends that the enhancement was erroneously applied for two reasons: (1) the interaction between two guidelines provisions renders the enhancement inapplicable; and (2) even if the enhancement could properly be applied, there was insufficient evidence to support its use. Our need to consider the second issue depends on our disposition of the first, and so we address each argument in turn.

The District Court adopted the Probation Department's guidelines calculation, which included a nine-level enhancement pursuant to U.S.S.G. § 2L2.1(b)(2)(C) because the asylum fraud offense involved at least 100 documents. This resulted in a Guidelines range of 63 to 78 months' imprisonment, to be followed by the mandatory and consecutive term of 24 months' imprisonment, pursuant to U.S.S.G. § 2B1.6 and 18 U.S.C. § 1028A, for Dumitru's aggravated

---

Guidelines calculation . . . or rests its sentence on a clearly erroneous finding of fact.").

identity theft conviction. Application Note 2 to § 2B1.6 reads, in relevant part:

> **Inapplicability of Chapter Two Enhancement.** If a sentence under this guideline is imposed in conjunction with a sentence for an underlying offense, do not apply any specific offense characteristic for the transfer, possession, or use of a means of identification when determining the sentence for the underlying offense. A sentence under this guideline accounts for this factor for the underlying offense of conviction, including any such enhancement that would apply based on conduct for which the defendant is accountable under § 1B1.3 (Relevant Conduct).

On appeal, Dumitru contends that this commentary prohibits the application of the § 2L2.1(b)(2) enhancement because that enhancement is a "specific offense characteristic for the transfer, possession, or use of a means of identification" in that it, too, penalizes Dumitru for improperly using her clients' means of identification

during her commission of asylum fraud.[24] Because Dumitru did not advance this argument below, we review for plain error.[25]

We may, in our discretion, correct an error not raised at trial where "(1) there is an error; (2) the error is clear or obvious, rather than subject to reasonable dispute; (3) the error affected the appellant's substantial rights, which in the ordinary case means it affected the outcome of the district court proceedings; and (4) the error seriously affects the fairness, integrity or public reputation of judicial proceedings."[26]

We would agree that the District Court erred in applying the § 2L2.1(b)(2) enhancement if it imposed the enhancement *because of* Dumitru's "transfer, possession, or use of a means of identification."[27]

---

[24] U.S.S.G. § 2B1.6, n.2.

[25] *United States v. Villafuerte*, 502 F.3d 204, 207–08 (2d Cir. 2007).

[26] *United States v. Marcus*, 560 U.S. 258, 262 (2010) (internal quotation marks and alterations omitted).

[27] U.S.S.G. § 2B1.6, n.2.

The cases Dumitru cites in support of her position all share this common thread: in each case where an enhancement was held to have been improperly applied, the basis for it was the exact same conduct that formed the basis of the aggravated identity theft conviction.[28] But that is not the case here.

While Dumitru may have used her clients' means of identification "during and in relation to" her commission of asylum fraud, it was not a necessary element of that crime. The statute Dumitru was charged with violating in Count 3 proscribes

---

[28] *See, e.g.*, *United States v. Charles*, 757 F.3d 1222, 1226–27 (11th Cir. 2014) (holding that enhancement for an offense involving the trafficking of an "unauthorized access device" was prohibited by § 2B1.6 because trafficking requires a transfer and an access device constitutes a "means of identification"); *United States v. Ferdinand*, 517 F. App'x 651, 653 (11th Cir. 2013) (unpublished) (concluding that it was error to apply an enhancement for 'the unauthorized transfer or use of any means of identification unlawfully to produce or obtain any other means of identification' in light of § 2B1.6 Application Note 2); *United States v. Giannone*, 360 F. App'x 473, 477–78 (4th Cir. 2010) (unpublished) (holding that § 2B1.6 precludes application of enhancement for "the trafficking of an unauthorized access device"); *United States v. Doss*, 741 F.3d 763, 767 (7th Cir. 2013) (same); *United States v. Xiao Yong Zheng*, 762 F.3d 605, 608-09 (7th Cir. 2014) (holding that district court erred in applying enhancement for the fraudulent use of a foreign passport, which constitutes a "means of identification").

"knowingly subscrib[ing] as true[] any false statement with respect to a material fact in any application, affidavit, or other document required by the immigration laws or regulations prescribed thereunder, or knowingly present[ing] any such application, affidavit, or other document which contains any such false statement."[29] In addition to misappropriating her clients' identifying information by directing her staff to forge their signatures and then using those signatures in submissions to the Government, Dumitru signed, under penalty of perjury, and presented asylum applications that she knew to contain false information. An enhancement aimed at holding Dumitru responsible for the breadth of the latter conduct is not an enhancement "for the transfer, possession, or use of a means of identification" and is not rendered inapplicable simply because Dumitru also misused her clients' means of identification in the process. We cannot say it was error, much less plain error, for the

---

[29] 18 U.S.C. § 1546(a).

District Court to apply the § 2L2.1(b)(2) enhancement to Dumitru's base offense level.

Dumitru next contends that, even if Application Note 2 to § 2B1.6 does not bar application of the § 2L2.1(b)(2) enhancement, the District Court erred in applying that enhancement because it was unsupported by the record evidence. "The facts justifying a sentence imposed under the Guidelines need be proved only by a preponderance of the evidence," and we review the District Court's "findings of fact for clear error."[30] We will find clear error only where we as "the reviewing court on the entire evidence [are] left with the

---

[30] *United States v. Escalera*, 957 F.3d 122, 138–39 (2d Cir. 2020).

definite and firm conviction that a mistake has been committed."[31]

Dumitru cannot meet this burden.

At trial, a government investigator testified that, of 105 asylum applications submitted by Dumitru that he reviewed, 100 contained identical or nearly identical narrative statements. Miron, Dumitru's former employee, estimated that she alone prepared "over a hundred" asylum applications using recycled, non-specific narratives.[32] Miron further testified that there were other staff members who performed similar tasks to her and that Dumitru filed "anywhere from [fifty] to a hundred" asylum cases per year in 2015, 2016, and 2017.[33] Even considering Dumitru's attempts to cast doubt on the record evidence as inconclusive as to whether the number of documents involved actually passed the 100 document threshold, we hold that the trial

---

[31] *Anderson v. City of Bessemer*, 470 U.S. 564, 573 (1985) (internal quotation marks omitted).

[32] App'x at 44, 46.

[33] App'x at 36, 39.

record reveals sufficient evidence from which the District Court could find, by a preponderance of the evidence, that Dumitru's asylum fraud involved the requisite 100 or more documents. Dumitru's sufficiency-of-the-evidence argument therefore fails.

### III. CONCLUSION

To summarize, we hold as follows:

(1) the evidence at trial was sufficient to sustain a conviction for aggravated identity theft, even under the narrow view of the aggravated identity theft statute promoted by Dumitru; and

(2) the district court did not err in applying a sentencing enhancement for the involvement of 100 or more documents in the relevant offense.

For the foregoing reasons, we **AFFIRM** the District Court's May 8, 2019 judgment of conviction.

JON O. NEWMAN, *Circuit Judge*, concurring:

Prosecutors have extremely broad power to decide which criminal statutes to charge a defendant with violating. That awesome power is only slightly limited. The prosecutor must have probable cause to believe that the defendant has violated the statutes selected,[1] and should have a good faith belief that sufficient evidence of each statutory violation exists to permit a jury to find guilt beyond a reasonable doubt.[2] The double jeopardy clause of the Constitution assures that a prosecutor may not charge a defendant under a statute that has the same elements as another statute under which the defendant has been convicted, acquitted, or been in jeopardy of being convicted. *See Blockburger v. United States*, 284 U.S. 299, 303-04 (1932). And in drafting an indictment that a grand jury will be asked to return, a prosecutor must not charge two statutory violations in the same (duplicitous) count, see Fed. R. Crim. P. 8(a); *United States v. Sturdivant*, 244 F.3d

---

[1] *See United States v. Lovasco*, 431 U.S. 783, 791 (1977) ("[I]t is unprofessional conduct for a prosecutor to recommend an indictment on less than probable cause."); American Bar Association, Criminal Justice Standards for the Prosecution Function, Standard 3-4.3(a) (4th ed. 2017) ("A prosecutor should seek or file criminal charges only if the prosecutor reasonably believes that the charges are supported by probable cause.").

[2] *Id*. ("A prosecutor should seek or file criminal charges only if the prosecutor reasonably believes . . . that admissible evidence will be sufficient to support conviction beyond a reasonable doubt.").

1

71, 75 (2d Cir. 2001), nor split one statutory violation into two (multiplicitous) counts, *see United States v. Jones*, 482 F.3d 60, 72 (2d Cir. 2006).

Beyond these limitations, however, every prosecutor is properly expected to use judgment in deciding whether to charge all the statutory violations that conceivably could be charged.[3] At least five considerations should be borne in mind in exercising that judgment. I list the risks of including similar, but technically distinct, counts in the order in which such risks might arise:

(1) The risk of erroneous language in a jury charge as to a particular count, possibly precipitating a needless reversal and retrial;

(2) The risk of jury confusion;

(3) The risk that jurors considering a close case that has divided them on an initial vote will reach a compromise of unanimity by acquitting on one count and convicting on another count;

(4) The risk that, upon conviction on multiple counts, a judge will impose an unduly harsh sentence by running prison terms consecutively;[4]

---

[3] *Id.* ("A prosecutor should seek or file criminal charges only if the prosecutor reasonably believes . . . that the decision to charge is in the interests of justice.").

[4] See, *e.g., United States v. Golomb*, 754 F.2d 86, 91 (2d Cir. 1985) (remanding for explanation why sentences on eleven counts of property offenses were imposed to run consecutively on a first offender for a total sentence of twenty-six years). Under the Sentencing Guidelines applicable to federal court sentences imposed after October 1987, this risk has been largely minimized. *See* United States Sentencing Guidelines § 5G1.2(c) ("If the sentence imposed on the count carrying

(5) The risk of subjecting a convicted defendant to harsher conditions of confinement based on the number of counts of conviction.

The pending appeal strikes me as an example of a prosecutor's decision to charge multiple counts that approaches, if not exceeds, the limits of fairness. However, because the prosecutor's selection of statutory violations to be charged in this case encounters no legal obstacle that a court is entitled to invoke, I concur in the Court's opinion and judgment, but write separately to express views on the questionable fairness[5] of the multiple counts in this case, views developed in many years as a prosecutor, trial judge, and appellate judge.

My first concern focuses on the inclusion of Count 2, charging a violation of 18 U.S.C. § 1001, in addition to Count 1, charging a violation of 18 U.S.C. § 1546(a). Congress enacted section 1546(a) to punish those who, like the Appellant, falsified documents concerning immigrations laws, in this case, applications for asylum. This statute precisely applies to the conduct of the Appellant, who prepared and submitted a large number of false asylum applications. Congress enacted section

---

the highest statutory maximum is adequate to achieve the total punishment [prescribed by the Guidelines], then the sentences on all counts shall run concurrently, except to the extent otherwise required by law.").

[5] *See* Jon O. Newman, *Rethinking Fairness: Perspectives on the Litigation Process*, 94 Yale L.J. 1643 (1985) (Cardozo Lecture) (reprinted in The Record of the New York City Bar Ass'n, Jan./Feb. 1985, at 12).

1001 to punish those who "make[] any materially false . . . statement" "in any matter within the jurisdiction of the executive, legislative, or judicial branch of the Government of the United States." This statute broadly applies to the conduct of the Appellant in preparing and submitting the false asylum applications. The question is: Was it fair to charge a violation of section 1001 in addition to charging a violation of section 1546(a)?[6]

---

[6] The addition of the section 1001 count appears to have caused the Appellant no adverse consequence thus far because the charge on these counts encountered no objection, the jury convicted on both counts, and concurrent sentences were imposed on Counts 1 and 2. Whether there will be any adverse consequence relating to the conditions of confinement seems unlikely, and, in any event, the Appellant raises no issue on appeal concerning any arguable multiplicity arising from Counts 1 and 2.

In the District Court, a multiplicity objection was raised and rejected by Judge Kaplan on the ground that, under the law of this Circuit, a motion to dismiss a count as multiplicitous "is premature in light of *United States v. Josephberg*, 459 F.3d 350, 355 (2d Cir. 2006)." *Josephberg*, considering a multiplicity argument based on the Double Jeopardy Clause's prohibition of multiple punishments for the same offense, ruled that a multiplicity objection raised "prior to trial was at best premature" because the jury might convict on no more than one of the counts claimed to be multiplicitous, and, if the jury convicts on more than one of such counts, judgment should be entered on only one such count. *Id*. That explanation gave no consideration to the concerns I have identified above.

Judge Kaplan also expressed "some skepticism" on the merits of the multiplicity objection, noting "that conviction under 18 U.S.C. § 1001, the basis for Count Two, requires proof that the statements and representations have been made not only knowingly, but also willfully, whereas 18 U.S.C. § 1546 (a), the basis for Count One, does not require proof of willfulness." *United States v. Dumitru*, No. 1-18-cr-00243-LAK, Dkt. No. 19 (S.D.N.Y. June 26, 2018) ("Dist. Ct. case"). Because no multiplicity claim is raised on appeal, I express no opinion on Judge Kaplan's dictum about the elements required for conviction under both statutes.

4

Six months after filing the indictment containing Counts 1 and 2, the Government filed a new indictment adding Count 3,[7] captioned "Aggravated Identity Theft," which charged that the Appellant "did transfer, possess, and use, without lawful authority, a means of identification of another person, during and in relation to a felony . . . to wit, DUMITRU used and transferred the names, dates of birth, alien registration numbers and government passport numbers of applicants for asylum during and in relation to the asylum fraud and false statement violations charged in Counts One and Two of this Indictment" in violation of 18 U.S.C. § 1028A(a)(1). Having charged the Appellant with preparing false asylum applications in Count 2, the Government charged in Count 3 that the Appellant had used and transferred the asylum applicants' identifying information in preparing the same applications. And, with one possible exception,[8] all of these applicants wanted the Appellant to file asylum applications on their behalf.

---

[7] The first indictment was filed Mar. 27, 2018, *see* Dist. Ct. case, Dkt. No. 1; the superseding indictment was filed Sept. 13, 2018, *see id*. Dkt. No. 27.

[8] One trial witness, Suedin Chiciu, testified that he thought that the Appellant was only going to represent him in the Immigration Court. Sp. App'x at 36-37. The jury charge did not require the jury to credit this testimony in order to convict on Count 3.

Why did the Government add Count 3? The answer is not difficult to discover. Although Counts 1 and 2 each subjected the Appellant to a maximum prison term of five years, Count 3 subjected her to a mandatory consecutive prison term of two years. 18 U.S.C. § 1028A(a)(1). The Government wanted those additional two years of punishment. As it turned out, Judge Kaplan's aggregate sentence of five years could have been achieved by imposing concurrent five-year sentences on Counts 1 and 2 in the absence of Count 3. He reached the same result by imposing concurrent three-year sentences on Counts 1 and 2 and the mandatory consecutive two-year sentence on Count 3.

Now that the Government has obtained the aggregate five-year sentence on this first offender who has not committed a crime of violence, it finds itself obliged to prepare a 37-page brief resisting the Appellant's claim on appeal that the facts of her case do not establish a violation of the statute titled "Aggravated identify theft." Clearly, the Appellant did not steal anyone's identity,[9] nor did she try to pass herself off as some other person seeking a benefit. No Government official thought that the Appellant was using a client's name to obtain asylum for herself.

---

[9] I acknowledge that the title of a statute does not necessarily limit its coverage.

What Dumitru did was file false asylum applications, the precise conduct made unlawful by the statute alleged to have been violated in Count 1.

Nevertheless, as persuasively explained in the Court's per curiam opinion, the substantial weight of relevant authority from other circuits supports a rejection of the Appellant's claim that her conduct, including forging the names of her clients to the false asylum applications, violated subsection 1028A(a)(1). If those courts, and now ours, have misinterpreted the aggravated identity theft statute, correction is available from Congress.

Atty. Andreea Dumitru prepared and submitted false asylum applications for a large number of her clients. For that unlawful conduct the Government charged her with violating three different statutes. The three-count indictment was lawful. The question remains: Was it fair?